# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT
## WESTERN DIVISION

| | | |
|---|---|---|
| PATRICK KENNEALLY, in his official capacity as McHENRY COUNTY STATE'S ATTORNEY and on behalf of the PEOPLE OF THE STATE OF ILLINOIS, and McHENRY COUNTY, body politic and corporate, | ) ) ) ) ) ) ) | |
| | ) | Case No. : 3:23-cv-50039 |
| Plaintiffs, | ) ) | Hon. Iain D. Johnston |
| v. | ) ) ) | |
| KWAME RAOUL, in his official capacity as Illinois Attorney General, and GOVERNOR J.B. PRITZKER, in his official capacity as Governor of the State of Illinois | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND INJUNCTIVE RELIEF

Patrick Kenneally, State's Attorney of McHenry County, on behalf of the People of McHenry County, brings this Memorandum in Support Motion for Preliminary Injunction and Injunctive Relief, and alleges as follows:

### The Parties

1.     Plaintiff Patrick Kenneally is the elected State's Attorney of McHenry County, Illinois, who has the authority to prosecute this cause of action on behalf of the People of McHenry County pursuant to 55 ILCS 5/3-9005(a)(1). In addition to the statutory powers afforded the McHenry County State's Attorney, he is vested with common law and constitutional authority analogous and largely coincident to the Illinois

Attorney General which includes the duty to represent the people in matters affected with a public interest.

2.    Plaintiff McHenry County is a body politic and corporate, existing under the constitution and laws of the State of Illinois.

3.    Defendant Kwame Raoul is the elected Attorney General of the State of Illinois.

4.    Defendant J.B. Pritzker is the elected Governor of the State of Illinois.

### Standing

5.    A State's Attorney may litigate in the public interest. *AFSCME, Council 31 v. Ryan,* 347 Ill. App. 3d 732 (5th Dist. 2004).

6.    The State's Attorney**,** as a constitutional officer with rights and duties analogous to or largely coincident with Attorney General, is the one to **"**represent the people in matters affected with a public interest.**"** *Kuntsman v. Nagano,* 389 Ill. 231, 249 (1945).   "It is presumed that [the State's Attorney] will act under such a heavy sense of public duty and obligation for enforcement of all our laws that he will commit no wrongful act.  If he does, the remedy must be by other well known means." *Id.* at 252.

7.    Illinois Rule of Professional Conduct 3.8 provides that "The duty of a public prosecutor is to seek justice, not merely to convict." The committee comments state that "the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice …"

2

8.    The State's attorney in his official capacity is the representative of all the people, including the defendant, and it was as much his duty to safeguard the constitutional rights of the defendants as those of any other citizen." *People v. Cochran*, 313 Ill. 508, 526 (1924).

9.    Public Act 102-1116 imposes on Plaintiff the obligation to execute criminal offenses.  The clear violation of the Second Amendment to the United States Constitution and Article I, Section 22 of the Illinois Constitution, Public Act 102-1116 places Plaintiff in an impossible ethical quandary of enforcing new, unconstitutional criminal offenses against citizens who are lawfully exercising their constitutional rights.

*Second Amendment Analysis*

10.    The Second Amendment to the United States Constitution states "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

11.    Article I, § 22 of the Illinois Constitution states "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed.

12.    In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the United States Supreme Court held that a statute which banned handgun possession in the home, and prohibited the rendering of a firearm in the home operable for the purpose of immediate self-defense, violated the Second Amendment.  In striking down the statute, the Supreme Court recognized the Second Amendment as a core protection within the Constitution, stating "There seems to us no doubt, on the basis of both text and history, that the Second

Amendment conferred an individual right to keep and bear arms." *Id.,* 595. The *Heller* Court went on to hold that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense.

13.     In *McDonald v. City of Chicago,* 130 S.Ct. 3020 (2010), the United States Supreme Court struck down a handgun ban enacted by the City of Chicago based upon the Second Amendment. In so doing, the Supreme Court held that the Second Amendment was among those fundamental rights necessary to our system of ordered liberty, and, as such, that the right to bear arms was incorporated into the Fourteenth Amendment's Due Process Clause and made mandatory upon the states.

14.     Numerous cases involving the right to bear arms were decided since the Supreme Court's *Heller* and *McDonald* decisions. Courts throughout the nation articulated divergent analytical standards attempting to define the manner in which the government could enact limitations on a citizen's right to bear arms.

15.     The U.S. Supreme Court ended that debate in June 2022 when it decided *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022).

16.     In *Bruen,* a firearm applicant who wanted to possess a firearm at home (or in his place of business)**,** was required to prove to a licensing officer that, he was of good moral character, had no history of crime or mental illness, and that no good cause existed for the denial of a firearm license. If he wanted to carry a firearm outside his home or place of business for self-defense, the applicant was required to obtain an unrestricted

license to have and carry a concealed handgun; in order to do so, the applicant had to prove that proper cause existed to issue it. *Id.*, 2117.

17.     In holding that the New York regulation was an unconstitutional violation of the right to bear arms, the court defined the minimum level of protections that a government has to guarantee its citizens to avoid violating the Second Amendment. Specifically, the court held that "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*, 2129–30.  The court went on to state that courts considering challenged Second Amendment regulation should determine whether "modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified. *Id.*, 2133.

18.     As will be explained below, Public Act 102-1116 cannot withstand scrutiny under this standard.

***Public Act 102-1116's Assault Weapons Ban***

19.     Public Act 102-1116 enacted a ban on "assault weapons," which are in fact common semiautomatic firearms, and criminalized any act to "manufacture, deliver, sell, import, purchase, or possess said firearms" in Illinois, pursuant to 720 ILCS 5/24-1.9 ("the Firearm Ban").

20.     This Firearm Ban applies to "any person" within the State of Illinois, and excepts from its sweep only current and retired law enforcement officers, government agencies, prison officials, members of the military, and certain private security contractors. 720 ILCS 5/24-1.9(e)(1)-(7).

21.     Any ordinary person in Illinois who legally possessed an "assault weapon" before the effective date of Public Act 102-1116 is required to register the firearm with the Illinois State Police, can only possess it on a very limited set of locations, and may transport them only to and from those locations, unloaded and in a case. 720 ILCS 5/24-1.9(d).

22.     A first-time violation of the prohibition on possession constitutes a Class A misdemeanor. A first-time violation of the prohibition on manufacture, sale, deliver, import, and purchase constitutes a Class 3 felony. 720 ILCS 5/24-1(b).

23.     The Firearm Ban defines an "assault weapon" and bans any semiautomatic rifle with the capacity to accept a magazine holding more than ten rounds of ammunition, if it has any one of the following features:

(i) a pistol grip or thumbhole stock;
(ii) any feature capable of functioning as a protruding grip that can be held by the non- trigger hand;
(iii) a folding, telescoping, thumbhole, or detachable stock, or a stock that is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability of, the weapon;
(iv) a flash suppressor;
(v) a grenade launcher;

(vi) a shroud attached to the barrel or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel. 720 ILCS 5/24-1.9(a)(1)(A).

24.     Additionally, Public Act 102-1116 bans "any part or combination of parts designed or intended to convert a firearm into an assault weapon, including any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person." 720 ILCS 5/24-1.9(a)(1)(I).

25.     Finally, Public Act 102-1116 Statute specifically enumerates banned "assault weapons" (including copies, duplicates, variants, and altered facsimiles). The specifically banned firearms are as follows:

(i) All AK types, including the following:

> (I) AK, AK47, AK47S, AK–74, AKM, AKS, ARM, MAK90, MISR, NHM90, NHM91, SA85, SA93, Vector Arms AK–47, VEPR, WASR–10, and WUM.
> (II) IZHMASH Saiga AK.
> (III) MAADI AK47 and ARM.
> (IV) Norinco 56S, 56S2, 84S, and 86S.
> (V) Poly Technologies AK47 and AKS.
> (VI) SKS with a detachable magazine.

(ii) all AR types, including the following:

> (I) AR–10.
> (II) AR–15.
> (III) Alexander Arms Overmatch Plus 16.
> (IV) Armalite M15 22LR Carbine.
> (V) Armalite M15–T.
> (VI) Barrett REC7.
> (VII) Beretta AR–70.
> (VIII) Black Rain Ordnance Recon Scout.

(IX) Bushmaster ACR.
(X) Bushmaster Carbon 15.
(XI) Bushmaster MOE series.
(XII) Bushmaster XM15.
(XIII) Chiappa Firearms MFour rifles.
(XIV) Colt Match Target rifles.
(XV) CORE Rifle Systems CORE15 rifles.
(XVI) Daniel Defense M4A1 rifles.
(XVII) Devil Dog Arms 15 Series rifles.
(XVIII) Diamondback DB15 rifles.
(XIX) DoubleStar AR rifles.
(XX) DPMS Tactical rifles.
(XXI) DSA Inc. ZM–4 Carbine.
(XXII) Heckler & Koch MR556.
(XXIII) High Standard HSA–15 rifles.
(XXIV) Jesse James Nomad AR–15 rifle.
(XXV) Knight's Armament SR–15.
(XXVI) Lancer L15 rifles.
(XXVII) MGI Hydra Series rifles.
(XXVIII) Mossberg MMR Tactical rifles.
(XXIX) Noreen Firearms BN 36 rifle.
(XXX) Olympic Arms.
(XXXI) POF USA P415.
(XXXII) Precision Firearms AR rifles.
(XXXIII) Remington R–15 rifles.
(XXXIV) Rhino Arms AR rifles.
(XXXV) Rock River Arms LAR–15 or Rock River Arms LAR–47.
(XXXVI) Sig Sauer SIG516 rifles and MCX rifles.
(XXXVII) Smith & Wesson M&P15 rifles.
(XXXVIII) Stag Arms AR rifles.
(XXXIX) Sturm, Ruger & Co. SR556 and AR–556 rifles.
(XL) Uselton Arms Air-Lite M–4 rifles.
(XLI) Windham Weaponry AR rifles.
(XLII) WMD Guns Big Beast.
(XLIII) Yankee Hill Machine Company, Inc. YHM–15 rifles.

(iii) Barrett M107A1.
(iv) Barrett M82A1.
(v) Beretta CX4 Storm.
(vi) Calico Liberty Series.
(vii) CETME Sporter.

(viii) Daewoo K–1, K–2, Max 1, Max 2, AR 100, and AR 110C.
(ix) Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000.
(x) Feather Industries AT–9.
(xi) Galil Model AR and Model ARM.
(xii) Hi-Point Carbine.
(xiii) HK–91, HK–93, HK–94, HK–PSG–1, and HK USC.
(xiv) IWI TAVOR, Galil ACE rifle.
(xv) Kel-Tec Sub-2000, SU–16, and RFB.
(xvi) SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX.
(xvii) Springfield Armory SAR–48.
(xviii) Steyr AUG.
(xix) Sturm, Ruger & Co. Mini-14 Tactical Rifle M–14/20CF.
(xx) All Thompson rifles, including the following:

> (I) Thompson M1SB.
> (II) Thompson T1100D.
> (III) Thompson T150D.
> (IV) Thompson T1B.
> (V) Thompson T1B100D.
> (VI) Thompson T1B50D.
> (VII) Thompson T1BSB.
> (VIII) Thompson T1–C.
> (IX) Thompson T1D.
> (X) Thompson T1SB.
> (XI) Thompson T5.
> (XII) Thompson T5100D.
> (XIII) Thompson TM1.
> (XIV) Thompson TM1C.

(xxi) UMAREX UZI rifle.
(xxii) UZI Mini Carbine, UZI Model A Carbine, and UZI Model B Carbine.
(xxiii) Valmet M62S, M71S, and M78.
(xxiv) Vector Arms UZI Type.
(xxv) Weaver Arms Nighthawk.
(xxvi) Wilkinson Arms Linda Carbine. 720 ILCS 5/24-1.9(a)(1)(J).

26. Semiautomatic rifles "traditionally have been widely accepted as lawful possessions," *see Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-

15 semiautomatic rifle), and they are in common use, *see Heller v. Dist. of Columbia*, 670

F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*") ("We think it clear enough in the record that

semi- automatic rifles . . . are indeed in 'common use' as the plaintiffs contend.").

27.     Rifles built on an "AR-style" platform are the exact type of firearm that

Public Act 102-1116 bans.  "AR" is short for ArmaLite Rifle; ArmaLite is a manufacturer

that originally designed the platform.

28.     AR-15 rifles are among the most popular firearms in the nation. Recent

firearms research indicates that over 24.6 million Americans have owned AR-15 or similar

modern semiautomatic rifles. William English, PhD, *2021 National Firearms Survey:*

*Updated Analysis Including Types of Firearms Owned* at 2, 33 (May 13, 2022),

https://bit.ly/3yPfoHw.

29.     Approximately 20% of all firearms sold in recent years were rifles of the

type banned by Public Act 102-1116. NAT'L SHOOTING SPORTS FOUND., INC.,

*Firearms Retailer Survey Report, 2021* at 9, *available at* https://bit.ly/3gWhI8E.

30.     In 2020, more than 20 million adults participated in target or sport shooting

with semiautomatic rifles like those banned by Public Act 102-1116. NAT'L SHOOTING

SPORTS FOUND., INC., *Sport Shooting Participation in the U.S. in 2020* at iii, *available at*

https://bit.ly/3sPuEQl (last accessed Jan. 12, 2023).

31.     The banned semiautomatic firearms fire only one round for each trigger

pull. They are not machine guns. *Staples*, 511 U.S. at 620 n.1.

32.     While an AR-15 can only fire as frequently as a person can pull its trigger, an M249 light machine gun, commonly used by the U.S. military, can fire between 750 and 1,000 rounds per minute, MILITARY ANALYSIS NETWORK, *Squad Automatic Weapon (SAW), M249 Light Machine Gun*, *available at* https://bit.ly/3tsQGtd (last accessed Jan. 12, 2023). "Heavy" machine guns like the M61 series can fire significantly larger caliber ammunition (20mm) much faster yet (6,000 rounds per minute), MILITARY ANALYSIS NETWORK, *GAU-4mm Vulcan M61A1/M61A2 20mm Automatic Gun*, *available at* https://bit.ly/3ttnemV (last accessed Jan. 12, 2023).

33.     The most critical common use of the firearms banned by Public Act 102-1116 is self-defense. A majority of owners of AR-style rifles said that they owned their firearms for self- defense.  English, *2021 National Firearms Survey*, *supra,* at 34 (61.9% owned for home defense; 34.6% owned for defense outside the home).

34.     Owners of AR-15s and other similar rifles rated self -defense as over 8 out of 10 in importance for owning them, the second-highest rating after recreational target shooting. NAT'L SHOOTING SPORTS FOUND., INC., *Modern Sporting Rifle: Comprehensive Consumer Report* 18 (July 14, 2022), *available at* https://bit.ly/3SSrVjM.

35.     An AR-15 rifle is an ideal firearm for home defense. Most AR-style firearms are chambered for 5.56x45mm NATO, which is similar to .223 Remington ammunition. This is a relatively inexpensive and common cartridge that is particularly well suited for

home-defense purposes because it has sufficient stopping power in the event of a home intrusion, but quickly loses velocity after passing through a target.

36.    Most handgun rounds have greater mass, maintain velocity after passing through walls and other objects, and pose significantly greater risks to unintended targets in the home.

37.    Like the AR-15, generally, many of the specific features banned by Illinois aid home defense. A flash suppressor, for example, not only reduces the chances that a home- invader will identify his victim's position but also protects a homeowner against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 397 (1994).

38.    Folding and telescoping stocks increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces. *Id.* at 398–99.

39.    A telescoping stock also allows a firearm to be better fitted to an individual user, enhancing the ability of an individual to use the firearm safely.

40.    Pistol grips improve accuracy, reducing the risk of errant shots by stabilizing the firearm while firing from the shoulder. *Id.* at 396.

41.    Detachable magazines not only aid in reloading a firearm in tense defensive situations, but often are necessary to safely and quickly remedy malfunctions.

12

42.     Home defense situations are not uncommon.  According to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive firearm uses in the United States have determined that there are up to 2.5 million instances each year in which civilians used firearms for home defense. Gary Kleck, Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. OF CRIM. L. & CRIMINOLOGY 150, 164 (1995).

43.     Other common, lawful uses of the banned firearms are hunting and sport. At least a third of all gun-owners use a firearm for hunting or sport shooting, and recreational target shooting is a top reason for owning semiautomatic rifles like those banned by Public Act 102-1116.

44.     The banned features of semiautomatic firearms serve other legitimate purposes. For example, folding and telescoping stocks allow for safe transportation, and ease carriage over long distances while hunting.

45.     Both telescoping stocks and protruding grips open hunting and sport-shooting to those for whom recoil poses a challenge. Detachable magazines have the same benefits in hunting and sport-shooting as they do in home defense—improved reloading and remedying of malfunctions. And flash suppressors promote accuracy in target-shooting and hunting (especially in reduced lighting conditions).

46.     Assault weapons are not commonly used to commit crime. One study found that these arms "are used in a small fraction of gun crimes." Christopher Koper, et al., *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), U.S. DEP'T OF JUST., *available at* https://bit.ly/3hZiy5v.

47.     According to FBI statistics in 2019 there were only 364 homicides known to be committed with rifles of any type, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects. U.S. Expanded Homicide Table 8, Crime in the United States, DEP'T OF JUST. (FBI 2019), available at https://bit.ly/3HdolNd.

***Public Act 102-1116's Magazine Ban***

48.     Public Act 102-1116 made it a crime to "manufacture, deliver, sell, purchase," or "possess" magazines it considers "large capacity ammunition feeding devices." 720 ILCS 5/24-1.10(b) and (c) (the "Magazine Ban").

49.     The Statute defines "large capacity ammunition devices" as "(1) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition for long guns and more than 15 rounds of ammunition for handguns; or (2) any combination of parts from which a device described in paragraph (1) can be assembled." 720 ILCS 5/24-1.10(a)(1)-(2).

50.     The Magazine Ban applies to any person within Illinois" and excepts from its regulation only current and retired law enforcement officers, government agencies, prison officials, members of the military, and certain private security contractors. 720 ILCS 5/24-1.10(e)(1)-(7).

51.     Any non-exempt person who legally possessed a banned magazine before the law's enactment now can only possess that magazine on a very limited set of premises and must transport it only to and from those locations, unloaded and in a case. 720 ILCS 5/24-1.10(d).

52.     A violation of the Magazine Ban carries "a fine of $1,000 for each violation." 720 ILCS 5/24-1.10(g).

53.     Although the State of Illinois describes magazines that can accept more than 10 rounds of ammunition for long guns and those that can accept more than 15 rounds for handguns as "large capacity magazines," this is a misnomer. Magazines capable of holding more than 10 or 15 rounds of ammunition are normal features of firearms in the United States and are more accurately described as "standard capacity magazines."

54.     Approximately 39 million Americans have owned at least one magazine that holds more than 10 rounds. *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned.*

55.     Many popular handguns are commonly sold with magazines holding more than 15 rounds of ammunition, and standard issue magazines for many popular rifles have a capacity of more than 10 rounds.

56.     Magazines over 10 rounds are in common usage. NSSF, *Modern Sporting Rifle Comprehensive Consumer Report*.

57.     Firearms capable of holding multiple rounds have existed since the 15th century, and firearms capable of firing more than ten rounds without reloading have existed at least since the 16th century. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 852–53 (2015).

58.     Firearms capable of firing multiple rounds without reloading were well known to the founding generation. In 1777, Joseph Belton demonstrated a repeating rifle that could hold 16 rounds of ammunition to members of the Continental Congress. Robert Held, THE BELTON SYSTEMS, 1758 & 1784–86: AMERICA'S FIRST REPEATING FIREARMS 37 (1986). Belton also informed Congress that he could equip his rifle with as many as 20 rounds at a time. Id. at 17.

59.     In the 19th century, multi-round rifles came into common usage. The 16-shot Henry Rifle, invented in 1861, was very popular. Soon after, the first Winchester rifle was produced it could hold 17 rounds in the magazine with one more in the chamber. Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE FIREARMS AND THEIR VALUES 268 (6th ed. 1994).

60.     Criminals will not be deterred by the Magazine Ban. Hundreds of millions of magazines capable of holding more ten rounds are in circulation in America.  It will not be difficult for criminals to acquire them through illegal means.

61.     Plaintiff re-alleges paragraphs 1-60 is the fully set forth herein.

62.     The "assault weapons" are commonly possessed and used semiautomatic rifles. The same is true regarding 10 round magazines for long guns and 15 round magazines for handguns.  As it pertains to "assault weapons," the only difference vis-à-vis weapons that are not identified by Public Act 102–1116 as assault weapons, is that their distinguishing features make them safer and easier to use.

63.     Public Act 102–1116's Firearms Ban is effectively a ban on bearing semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

64.     Public Act 102–1116's Magazine Ban is effectively a ban on bearing magazines that are commonly possessed and used for lawful purposes, including self-defense in the home.

65.     As it relates to both the Firearms Ban and the Magazine Ban, contrary to *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), Public Act 102-1116 prohibits an individual's conduct that the Constitution presumptively protects. Defendants cannot justify its regulation by demonstrating that it is consistent with America's historical tradition of firearm regulation.  Public Act 102-1116 does not impose

17

a comparable burden on the right to bear arms that modern and historical regulations have done. The burden imposed by Public Act 102-1116 is not comparably justified.

66. On January 20, 2023, Plaintiff was sued in the United States District Court for the Southern District of Illinois in *Marengo Guns, Inc., et al., v. Patrick Kenneally, et al.,* 3:23-cv-141. The pleading in said case seeks declaratory and injunctive relief against Plaintiff, declaring Public Act 102-1116 to be an unconstitutional infringement the of named plaintiffs' Second Amendment rights, based upon the U.S. Supreme Court's decision in *Bruen*. Said pleading also seeks to recover attorneys fees and costs against Plaintiff under 42 U.S.C. § 1983 for Plaintiff's alleged "enforcement" of Public Act 102-1116 against the Plaintiff Marengo Guns Inc. Other than attempting to recover attorneys fees and costs against Plaintiff under § 1983, Plaintiff cannot find fault with the named plaintiffs' Second Amendment analysis of Public Act 102-1116.

67. Plaintiff has a protectable interest and clearly ascertained right that needs protection in not being required to undertake enforcement of laws that violate the U.S. and Illinois Constitutions, as well as requires that breach of his ethical duties as provided for by the Illinois Rules of Professional Conduct.

68. Plaintiff is likely to succeed at a trial on the merits as set forth above.

69. There is no adequate remedy at law available to Plaintiff for the exigencies alleged above. Plaintiff is not seeking money damages. Infringement of the Second Amendment cannot be compensated by damages. *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

70.    If granted, entering injunctive would not cause injury to the general public.

71.    Plaintiff will suffer irreparable harm if injunctive relief is not entered by the Court because Plaintiff will otherwise be required to enforce unconstitutional laws against the public.

72.    Plaintiff will suffer irreparable harm from being compelled to enforce Public Act 102-1116 against the people of Illinois who have the right to bear arms under the Second Amendment. The "loss of constitutional freedom, for even minimal periods of time, unquestionably constitutes irreparable injury. *Mills v. District of Columbia*, 387 U.S. App. D.C. 221, 571 F.3d 1304, 1312 (D.C. Cir. 2009); and, *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The deprivation of constitutional rights unquestionably constitutes irreparable injury. *Planned Parenthood Arizona, Inc*. v. Humble, 753 F.3d 905, 911 (9th Cir. 2014)

WHEREFORE, Plaintiff requests of this Honorable Court that it enter an Order:

(a)    Enjoining Defendants' from enforcement of Public Act 102-1116;

(b)    Declaring Public Act 102-1116 unconstitutional and unenforceable;

(c)    Any and all other relief that the Court deems just and proper.

Respectfully Submitted by:

Patrick D. Kenneally
McHenry County State's Attorney

19

Patrick D. Kenneally
McHenry County State's Attorney
Troy C. Owens
Assistant State's Attorney
McHenry County Government Center
2200 North Seminary Avenue
Woodstock, Illinois 60098
815-334-4159 (phone)
815-334-0872 (fax)
pdkenneally@mchenrycountyil.gov
TCOwens@mchenrycountyil.gov

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT
WESTERN DIVISION

PATRICK KENNEALLY, in his official )
capacity as McHENRY COUNTY )
STATE'S ATTORNEY and on behalf of )
the PEOPLE OF THE STATE OF )
ILLINOIS, and McHENRY COUNTY, )
body politic and corporate, )        Case No. : 3:23-cv-50039
                                 )
        Plaintiffs,              )    Hon. Iain D. Johnston
                                 )
        v.                       )
                                 )
KWAME RAOUL, in his official     )
capacity as Illinois Attorney General, )
and GOVERNOR J.B. PRITZKER, in his )
official capacity as Governor of the )
State of Illinois                )
                                 )
        Defendants.              )

**VERIFICATION**

I, Patrick Kenneally, verify as follows:

1.      I am the Plaintiff in the present case, a citizen of the United States of America, and a resident of the State of Illinois. I am older than 18 years of age.

2.      I am State's Attorney of McHenry County, Illinois.

3.      I have personal knowledge of the matters that are alleged in my verified Complaint for Declaratory Judgment and Injunctive Relief, Motion for Preliminary Injunction and Injunctive Relief, and Memorandum in Support of Motion for Preliminary Injunction and Injunctive Relief, and if called to testify I would confidently testify as to the matters stated therein.

4.      I verify under penalty of perjury under the laws of the United States of America did the factual statements in verified Complaint for Declaratory Judgment and Injunctive Relief, Motion for Preliminary Injunction and Injunctive Relief, and Memorandum in Support of Motion for Preliminary Injunction and Injunctive Relief are true and accurate to the best of my understanding.

Respectfully Submitted by:

McHenry County State's Attorney

**Subscribed** and **Sworn** to before me this
_____14th_____ day of February, 2023

NOTARY PUBLIC

> OFFICIAL SEAL
> ROBIN L HARTMAN
> NOTARY PUBLIC, STATE OF ILLINOIS
> MY COMMISSION EXPIRES: 06/24/2026

Patrick D. Kenneally
McHenry County State's Attorney
Troy C. Owens
Assistant State's Attorney
McHenry County Government Center
2200 North Seminary Avenue
Woodstock, Illinois 60098
815-334-4159 (phone)
815-334-0872 (fax)
TCOwens@mchenrycountyil.gov

CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that a copy of Plaintiff's Memorandum in Support of Motion for Preliminary Injunction and Injunctive Relief was served on

Darren Kinkead
Office of the Illinois Attorney General
Attorney General's Office
100 W. Randolph St.
Chicago, IL 60601
Darren.kinkead@ilag.gov

By electronic filing via the ECF system on February14, 2023

/s/ Patrick D. Kenneally
McHenry County State's Attorney