**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

PATRICK KENNEALLY, in his official
capacity as McHENRY COUNTY
STATE'S ATTORNEY and on behalf of
the PEOPLE OF THE STATE OF
ILLINOIS, and McHENRY COUNTY,
body politic and corporate,

       Plaintiffs,

v.

KWAME RAOUL, in his official capacity
as Illinois Attorney General, and
GOVERNOR J.B. PRITZKER, in his
official capacity as Governor of the State of
Illinois,

       Defendants.

No. 3:23-cv-50039

**THE ATTORNEY GENERAL AND THE GOVERNOR'S RESPONSE IN
<u>OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

KWAME RAOUL
*Attorney General of Illinois*

Christopher G. Wells
*Chief, Public Interest Division*
Kathryn Hunt Muse
*Deputy Chief, Public Interest Division*
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, Illinois 60601

*Counsel for Attorney General Raoul
and Governor Pritzker*

## TABLE OF CONTENTS

TABLE OF CASES ............................................................................................................................ ii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND .............................................................................................................................. 3

LEGAL STANDARD........................................................................................................................ 8

ARGUMENT .................................................................................................................................... 9

    I.    Plaintiffs' claims are unlikely to succeed on the merits.................................................. 9

    A.   The legal framework for Second Amendment claims.................................................. 9

    B.   Plaintiffs cannot show that the Act regulates conduct protected by the text of the Second Amendment. ......................................................................................................................... 12

        1.   Large capacity magazines are not "arms." ....................................................... 13

        2.   Neither large capacity magazines nor assault weapons were in common use when the Second and Fourteenth Amendments were ratified. ........................................... 16

        3.   The Act restricts weapons and accessories not commonly used for self-defense today.......... 19

            a.   The restricted weapons are for war—not individual self-defense....................................... 20

            b.   Sales and ownership numbers do not show commonality or use. ....................................... 26

    C.   Even if Plaintiffs meet their textual burden, history and tradition allow regulating these weapons and accessories. ........................................................................................................................... 29

        1.   The Act responds to dramatic technological changes and unprecedented societal concerns. .. 31

        2.   There is a historical tradition of regulating dangerous and unusual weapons associated with increased criminality and violence. ......................................................................................... 33

            a.   From the Founding Era through the 19th century, legislatures enacted categorical restrictions on dangerous and unusual weapons, including specific firearms...................... 33

            b.   This tradition continued when 20th century legislatures regulated machine guns and assault weapons............................................................................................................................. 37

        3.   The Act is relevantly similar to historical regulations............................................................ 39

            a.   The Act's minimal burden on the right to self-defense is equivalent to, or less than, comparable historical regulations. ..................................................................................... 39

            b.   The Act's justifications are the same as historical analogues, but even more compelling. . 44

            c.   Plaintiffs' attempts to distinguish the Act from the historical tradition of regulating dangerous and unusual weapons will fail. .......................................................................... 45

    II.   Plaintiffs have not shown they will suffer irreparable harm. ................................................. 46

    III.  An injunction would harm the public interest........................................................................ 48

    IV.  The balance of equities tips firmly in favor of upholding the Act. ................................................ 49

    V.   Plaintiffs do not have standing to have the Act enjoined.......................................................... 49

CONCLUSION.................................................................................................................................. 50

### TABLE OF CASES

*Accuracy Firearms v. Pritzker*, No. 129421 (Ill. Sup. Ct.) .................................................. 8

*Antonyuk v. Bruen*, No. 22-cv-734, 2022 WL 3999791 (N.D.N.Y. Aug. 31, 2022) .................. 48

*Aposhian v. Barr*, 958 F.3d 969 (10th Cir. 2020) ........................................................... 48

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) ....... 11, 40

*Baird v. Bonta*, No. 19-cv-617, 2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) ........................... 10

*Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill.) ............................................................... 7, 8

*Bevis v. City of Naperville*, No. 22-cv-4775, 2023 WL 2077392 (N.D. Ill.) ....................... passim

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .............................................................. 17

*Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) ........................................................... 49

*Caulkins v. Pritzker*, No. 129453 (Ill. Sup. Ct.) ............................................................ 8

*Defense Distributed v. Bonta*, No. 22-cv-6200, 2022 WL 15524977 (C.D. Cal. 2022) .............. 41

*District of Columbia v. Heller* ("*Heller*"), 554 U.S. 570 (2008) ........................................ passim

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc) ............................................... 11

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................... 47

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .................................................... 16

*Fed. Firearms Licensees of Ill. v. Pritzker*, No. 23-cv-215 (S.D. Ill.) .................................... 7

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ................................. 11, 12, 26

*Gazzola v. Hochul*, No. 22-cv-1134, 2022 WL 17485810 (N.D.N.Y. Dec. 7, 2022) .................. 41

*GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357 (7th Cir. 2019) ................................ 9

*Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) ............................................................. 16

*Harrel v. Raoul*, No. 23-cv-141 (S.D. Ill.) ............................................................. 7, 8, 41

*Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244 (D.C. Cir. 2011) ........................ 11

*Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.) ................................................................. 7

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016) ............................................................... 11

*Ill. Republican Party v. Pritzker*, 973 F.3d 760 (7th Cir. 2020) .......................................... 9

*Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ................................ 14

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ...................................................... 11, 40, 48

*Langley v. Kelly*, No. 23-cv-192 (S.D. Ill.) .................................................................. 7

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ................................................................. 8

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..................................................... passim

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009) ..................................................... 47

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) ........................ 11, 48

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).............. passim

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................................... 49

*Nunn v. Georgia*, 1 Ga. 243 (Ga. 1846).................................................................................... 36

*Ocean State Tactical, LLC v. Rhode Island*,
    No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022) ............................... 13, 15, 49

*Oregon Firearms Fed'n, Inc. v. Brown*,
    No. 22-cv-1815, 2022 WL 17454829 (D. Or. Dec. 6, 2022)........................................... 15

*Orr v. Shicker*, 953 F.3d 490 (7th Cir. 2020).......................................................................... 9, 46

*People Who Care v. Rockford Bd. of Educ.*, 171 F.3d 1083 (7th Cir. 1999)............................... 46

*Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905 (9th Cir. 2014) ...................... 47, 48

*Simic v. City of Chicago*, 851 F.3d 734 (7th Cir. 2017) ............................................................. 49

*Speech First, Inc. v. Killeen*, 968 F.3d 628 (7th Cir. 2020)....................................................... 50

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018)........................................................... 13, 14

*United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012) ............................................................. 16

*United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019)............. 14

*United States v. Miller*, 307 U.S. 174 (1939)....................................................................... passim

*Wilson v. Cook Cnty.*, 937 F.3d 1028 (7th Cir. 2019)........................................................... 11, 12

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ................................................... 8, 46, 48

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ............................................................. 11, 26, 40

## INTRODUCTION

The Framers left us a legacy of self-government through our elected representatives. They did not leave future generations powerless to limit access to the preferred instruments of mass murderers. Illinois's elected representatives recently passed the Protect Illinois Communities Act, Public Act 102-1116 (the "Act"), to restrict access to assault weapons and large capacity magazines. They did so in response to a horror the Framers never imagined: a single person, armed with a lawfully purchased AR-15 rifle and its 30-round magazines, fired 83 shots, killed 7 people, and wounded 48 others in one minute at a July 4th parade in Highland Park. Patrick Kenneally, the McHenry County State's Attorney, has sued because he says the Second Amendment, as interpreted in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), gives people the right to buy and sell this weapon of war and others of equal potency. It doesn't.

*Bruen* reaffirmed the Second Amendment is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128. It did so based on *District of Columbia v. Heller*, 554 U.S. 570 (2008). Even as *Heller* invalidated a municipal ban on possessing handguns—"the quintessential self-defense weapon"—it recognized that "weapons that are most useful in military service—M-16 rifles and the like," can be banned. *Id.* at 627–29. *Heller* described a spectrum running from military-grade weapons, like the M-16, that may be banned, to weapons commonly used for self-defense, like handguns, that may not. The Act regulates weapons and accessories that fall on the military side of the *Heller* spectrum.

The most commercially successful weapons restricted by the Act, AR-15 rifles, are M-16s in every way except one: the ability to toggle between semi-automatic and automatic fire. That distinction is not constitutionally determinative, nor has it stopped mass shooters from using the AR-15 time and again to inflict battle-level casualty numbers in American schools and streets.

*Bruen* does not insulate the AR-15 or similar weapons of war from regulation. It is a case about public carry licensing that clarified how courts should analyze Second Amendment claims. *Bruen* requires courts to consider text and history. A plaintiff challenging a firearms regulation must first show the Second Amendment's "plain text" covers their proposed conduct. If the plaintiff meets this initial burden, the regulation of that conduct is still valid if the government can demonstrate it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2131. This challenge to the Act fails at both steps.

Mr. Kenneally and his client, McHenry County (together, "Plaintiffs"), cannot show assault weapons and large capacity magazines are "arms" protected by the Second Amendment. Large capacity magazines are accessories, not "arms," and they are neither independently capable of nor necessary for self-defense. They augment the lethality of firearms by reducing reloading in battle—or during the episodic massacres that now punctuate modern American life. The assault weapons regulated by the Act are also not "arms" protected by the Second Amendment because they are not commonly used for self-defense—"'the *central component* of the [Second Amendment] right itself.'" *Bruen*, 142 S. Ct. at 2135 (quoting *Heller*). By design and in practice, they exist for offensive infliction of mass casualties. While the potency of assault weapons may make them popular among a small percentage of Americans, it does not bring them within the Second Amendment's text. Only arms commonly used for self-defense, like handguns, qualify.

The Act's restrictions also are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. *Bruen* allows the use of "analogical reasoning" to show that a modern firearms regulation is relevantly similar to historical regulations. *Id.* at 2133. A "more nuanced approach" to analogical reasoning is appropriate where a case implicates "unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. This is exactly

2

such a case: the Act responds to an utterly modern concern borne of dramatic technological change—mass shootings perpetrated by lone individuals armed with assault weapons and large capacity magazines capable of carnage at a level inconceivable to the Framers.

Although the Act addresses a modern concern, it does so consistent with a historical tradition that both *Bruen* and *Heller* recognized: restrictions on "dangerous and unusual" weapons. *Bruen*, 142 S. Ct. at 2128. From the Colonial Era onward, legislatures have regulated categories of weapons thought to be particularly "dangerous" or "unusual"—from pocket pistols in the 17th and 18th centuries, to concealable "fighting knives" and revolvers in the 19th century, to machine guns and assault weapons in the 20th century. When specific weapons have generated new threats to public safety, elected representatives have responded. Consistent with this tradition, the federal government passed a ten-year ban on assault weapons in 1994 in response to the growing threat of mass shootings. And because of that same escalating threat, Illinois has joined 8 other states, the District of Columbia, and numerous localities in banning their sale now.

Plaintiffs' request to enjoin the Act must be denied. Plaintiffs are unlikely to succeed on their Second Amendment claims. They also have not met their burden on the other elements for relief: they are unlikely to suffer irreparable harm without an injunction; an injunction would not be in the public interest; and the balance of equities tips away from invalidating a critical public safety measure. Furthermore, Plaintiffs lack standing to seek invalidation of the Act in federal or state court, and the motion can be denied on that independent basis as well.

## BACKGROUND

**Mass shootings with assault weapons and large capacity magazines have skyrocketed nationally, especially in the last two decades**. Since the 9/11 terrorist attacks, the deadliest individual acts of intentional criminal violence in the United States have all been mass shootings. Ex. 4, Klarevas Dec. ¶ 11. While the U.S. population grew 20% during this time period, the number

of people killed in high-fatality mass shootings increased 260%. *Id*. The large and growing proportion of these massacres committed with assault weapons and large capacity magazines reflects a clear preference among the perpetrators for these weapons. *Id*. ¶¶ 12–13. Meanwhile, the ease with which these weapons and magazines can be operated by novices "transforms terrorists, criminals, deranged people, or disconnected teens with poor coping skills and intent to kill into killing machines." Ex. 5, Andrew Dec. ¶ 42.[1] Assault weapons and large capacity magazines ("LCMs") have come to present an "immitigable public safety threat" for communities and law enforcement. *Id*. ¶ 41. They enable scores of bullets to be fired in seconds, but the impact of those rounds devastates communities for years afterward.

**On July 4, 2022, a shooter rained gunfire down on an Independence Day parade in Highland Park, Illinois—killing 7 people and wounding 48 more**. The rapid rate of fire enabled by his assault weapon and the volume of rounds enabled by his large capacity magazines meant the shooter fired approximately 83 rounds in less than 60 seconds. Ex. 2, Morgan Decl. ¶¶ 19–20. Concealed on a rooftop where he could utilize the weapon's extended range, the shooter evaded apprehension on site. When his minute-long rampage was done, he left the scene. *Id.* ¶ 21.

Alarm quickly spread across Illinois while the shooter remained at large. *See* Ex. 1-A.[2] Thirty other localities canceled celebrations or closed beaches.[3] While civilians sheltered in their

---

[1] For example, the shooter in Uvalde, Texas who massacred elementary school children and staff in May 2022 "bought two AR-15 weapons less than a week before he committed a mass shooting. Without any training, and after owning the weapon only one week, he fatally shot 19 students and 2 teachers, and wounded 17 others." Ex. 5, Andrew Decl. ¶ 42.

[2] Exhibit 1 is a compilation of newspaper articles cited in this memorandum of law.

[3] Morton Grove, Skokie, Glenview, Lincolnshire, Glencoe, and Mount Prospect canceled their July 4th parades. Ex. 1-B. Northbrook, Winnetka, Waukegan, Vernon Hills, Buffalo Grove, Libertyville, St. Charles, and Huntley canceled fireworks. *Id.*; Ex. 1-D. Evanston and Lake Forest closed beaches. Ex. 1-B. Arlington Heights, Elgin, Deerfield, Downers Grove, Wilmette, Lombard, Oak Park, Elk Grove, Itasca, Rolling Meadows, Long Grove, Niles, Northfield, and Palatine also cancelled holiday events. Ex. 1-A; Ex. 1-C.

4

homes, massive numbers of local, state, and federal law enforcement officers mobilized to find the shooter. Ex. 1-D. Dozens of medical workers manned emergency rooms late in the day in case the killer shot more people. Ex. 1-E. In all, because one person was on the loose with an assault weapon, scores of law enforcement officers and medical workers were deployed, communities across northern Illinois cancelled celebrations, and thousands of residents could not leave home.

When the suspect was apprehended after approximately 8 hours, Ex. 2, Morgan Decl. ¶ 21, attention returned to the horror that had been inflicted that morning. Seven people lay dead. *Id*. ¶ 19. A toddler, found bloodstained and underneath the body of a dying man, had been orphaned. Ex. 1-F. Forty-eight people had been injured. Ex. 2, Morgan Decl. ¶ 19. Dozens more had been traumatized and "will never forget the bloodshed, carnage, and chaos" they witnessed that day. Ex. 2, Morgan Decl. ¶ 12. The parade was supposed to have been a procession of Cub Scouts, musicians, day campers, and "emissaries from every other kind of group that makes a community feel close-knit and secure"—in a town where there had not been a single murder from 2000 to 2020. Ex. 1-J. Instead, hospitals were flooded with patients from 8 to 85 years old. Ex. 1-K.

Attention next turned to solutions. Highland Park had banned sales of assault weapons and LCMs since 2013, Ex. 2, Morgan Decl. ¶ 26, but the shooter's assault weapons had been purchased elsewhere in Illinois, *id*. ¶ 22. Eight other states restricted access to assault weapons, LCMs, or both, but not Illinois. *Id*. ¶ 28. The shooting brought renewed urgency to enact legislation when the General Assembly reconvened. On December 1, 2022, the representative whose district includes Highland Park introduced House Bill 5855, which built on elements from another pending bill, House Bill 5522. *Id*. ¶ 30. Later that month, the legislature convened three public hearings to hear testimony about the proposed assault weapon and LCM restrictions reflected in the bills. *Id*. ¶¶ 31–32; *see also* Ex. 1-L. In one hearing, legislators heard a recording from the parade "that

5

began with a high-pitched cry from a child with not enough air to take a breath," followed by a child "scream[ing] in exasperation and fear" because of the chaos of the shooting. Ex. 1-M. A mother who attended the parade with her 6-year-old testified that the trauma of witnessing that day caused her son to wet the bed for months after. *Id*. In addition to "gut-wrenching testimony" from survivors of the Highland Park massacre, the House Committee heard testimony from community members across Illinois who supported—and opposed—restrictions. Ex. 2, Morgan Decl. ¶¶ 31–32. Following the hearings, the General Assembly passed the Act as House Bill 5471. *Id*. ¶ 33.

**On January 10, 2023, the Governor signed the Protect Illinois Communities Act into law.** The Act prohibits the sale, purchase, manufacture, delivery, or importation of "assault weapon[s]" and "large capacity ammunition feeding device[s]" (*i.e.*, LCMs)[4] in Illinois subject to certain exceptions for law enforcement, members of the military, and other professionals with similar firearms training and experience. *See generally* 720 ILCS 5/24-1.9 (new) & 1.10 (new).[5] Individuals who lawfully possessed assault weapons and LCMs covered by the Act as of the effective date can continue to possess them. *Id*. §§ 1.9(c)-(d) & 1.10(c)-(d). By January 1, 2024, to continue lawfully possessing an assault weapon, an individual must submit an endorsement affidavit. *Id*. This requirement does not extend to LCMs; individuals who lawfully possessed LCMs (over 15 rounds for handgun magazines or over 10 rounds for rifle magazines, *id*. § 1.10(a)) as of the Act's effective date can continue to possess them without registering, *id*. § 1.10(d).

Beginning April 10, 2023, the Act delineates locations where lawful owners of assault weapons and LCMs may possess them: (1) on private property they own or control (e.g., at home); (2) on private property not open to the public and with the owner's permission; (3) while on the

---

[4] In this filing, "large capacity magazines" and "LCMs" is used to refer to magazines that fall within the definition of "large capacity ammunition feeding devices" under the Act. *See* 720 ILCS 5/24-10(a) (new).
[5] Exhibit 3 provides compilations of images of firearms and magazines regulated by the Act.

premises of a firearms dealer or gunsmith for the purpose of repair; (4) while at a licensed firing range or sport shooting competition; or (5) while traveling to or from these locations. *Id.* § 1.9(d).

**Shortly after the Act took effect, multiple lawsuits challenged it**. Within weeks of the Act being signed, there were five separate actions against state officials in federal court challenging the Act as allegedly violating the Second Amendment.[6] The plaintiffs in these other actions comprise three groups: individuals who own restricted weapons and magazines, who want to buy them, or both; businesses who want to sell restricted items to customers beyond the groups excepted by the Act; and gun rights and industry advocacy organizations. Those plaintiffs sued state officials. The plaintiffs in one case, *Harrel v. Raoul*, No. 23-cv-141 (S.D. Ill.), also sued officials from the counties where the plaintiffs reside, including State's Attorney Kenneally.

Nine days after being named as a defendant in *Harrel*, Mr. Kenneally copied many of those allegations into a complaint he filed on behalf of his office and his county[7] in state court against Attorney General Kwame Raoul and Governor JB Pritzker ("Defendants"). Dkt. 1-1 ("Compl."). Upon seeing the *Harrel* allegations and the same Second Amendment claim as the other federal cases, Defendants removed this case the next day, *i.e.*, on January 27. On February 14, Plaintiffs filed a motion and supporting memorandum seeking a preliminary injunction prohibiting the Defendants from enforcing the Act. Dkt. 5 ("Mot."), Dkt. 6 ("Mem."). The memorandum appears

---

[6] *Harrel v. Raoul*, No. 23-cv-141 (S.D. Ill.) (referred to by Plaintiffs here as "*Marengo Guns, Inc., et al., v. Patrick Kenneally, et al*." on page 18 of the memorandum); *Langley v. Kelly*, No. 23-cv-192; *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill.); *Fed. Firearms Licensees of Ill. v. Pritzker*, No. 23-cv-215 (S.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.). The S.D. Ill. cases have been consolidated for pretrial purposes under No. 23-cv-209 (*Barnett*). There is a sixth action—a preexisting challenge to a city's restrictions—in which the plaintiffs amended their claims against local officials to argue the Act violates the Second Amendment. *Bevis v. City of Naperville*, No. 22-cv-4775 (N.D. Ill.), Dkt. 48. No state official was sued but the Attorney General has intervened to defend the Act before the district and appellate courts.

[7] Plaintiffs plead two separate parties and list themselves separately in the captions of the complaint, motion, and memorandum. Compl. 1, ¶¶ 1, 2; Mot. 1; Mem. 1. The singular "Plaintiff" is used throughout the body of the complaint, motion, and memorandum. Based on the captions, Defendants use the plural term.

to have been drafted by copying and pasting 70 paragraphs from their complaint and adding two paragraphs: 66, which describes *Harrel*, and 72, which cites three cases. *Compare* Compl. ¶¶ 1–65, 69–73 *with* Mem. ¶¶ 1–65, 67–71. On March 15, Mr. Kenneally answered in *Harrel* largely by admitting allegations and asking for relief that is within the relief requested from this Court.[8]

The only court to have considered whether the Act infringes the Second Amendment ruled that plaintiffs were unlikely to succeed on the merits of this claim.[9] On February 17, 2023, another Northern District of Illinois judge denied a motion for a temporary restraining order and preliminary injunction against the Act. *Bevis v. City of Naperville*, No. 22-cv-4775, 2023 WL 2077392 (N.D. Ill.) (J. Kendall).[10] Applying *Bruen*, the court found that the Act is "constitutionally sound." *Id.* at *18–30.[11]

## LEGAL STANDARD

Preliminary injunctive relief is "an extraordinary and drastic remedy, requiring "*a clear showing*" by the party requesting it. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs here must clearly show: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm without an injunction; (3) an injunction is in the public interest; and (4) the balance of equities tips in their favor. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24.

---

[8] *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill.), Dkt. 53, McHenry County Defs.' Answer to Compl. for Declaratory & Inj. Relief, at 37.

[9] The Act is also being challenged in state court in actions that do not allege federal claims. Some plaintiffs obtained orders, limited to themselves, based on state claims. The State is appealing those rulings. *Accuracy Firearms v. Pritzker*, No. 129421 (Ill. Sup. Ct.); *Caulkins v. Pritzker*, No. 129453 (Ill. Sup. Ct.).

[10] Cases that are published only on electronic databases such as Westlaw are attached as Exhibit 15.

[11] The State was not a party when the court ruled, thus the State's views were not considered by the court. The *Bevis* plaintiffs appealed the court's order and the State has intervened. No. 23-1353 (7th Cir.).

The movant "bears a significant burden" of making a "strong showing" that they are likely to succeed on the merits; neither a "better than negligible" chance of success nor a "possibility of success" is sufficient. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). In addition, Plaintiffs must show that they will "*likely* suffer irreparable harm" absent injunctive relief, which requires "more than a mere possibility of harm." *Orr*, 953 F.3d at 502. Plaintiffs who are less likely to win on the merits must make a stronger showing on the balancing of harms. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

## ARGUMENT

### I.    Plaintiffs' claims are unlikely to succeed on the merits.

Plaintiffs are unlikely to succeed on their claims, which all derive from the Second Amendment. *See* Compl. ¶¶ 9–18, 65, 69; Mem. ¶¶ 9–18, 65–67.[12] Plaintiffs are not likely to succeed on the merits because they cannot show that the "the Second Amendment's plain text covers" the weapons and accessories Plaintiffs seek to purchase and sell. *Bruen*, 142 S. Ct. at 2129–30. They are also unlikely to succeed on the merits because the Act "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

### A.   The legal framework for Second Amendment claims.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. In 2008, the Supreme Court held for the first time that this text protects "an individual right" that is "unconnected to militia service." *Heller*, 554 U.S. at 599, 608. *Heller* has been followed by two other decisions that discuss this right—*McDonald v. City of Chicago* in 2010 and *Bruen* in 2022. In all three cases, the Supreme Court emphasized that "individual self-defense"

---

[12] While Plaintiffs also mention the Illinois Constitution and Illinois Rules of Professional Conduct in their requests for injunctive relief, Compl. ¶ 69, Mem. ¶ 67, Plaintiffs fail to articulate any claim or basis for relief that is independent of the success of their federal Second Amendment arguments.

is "the '*central component*' of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. 742, 767, quoting *Heller*, 554 U.S. at 599).

When the *Heller* court recognized this right, it made clear that the right is "not unlimited." 554 U.S. at 626. The Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* The right "extends only to certain types of weapons." *Id.* at 623. For example, "weapons that are most useful in military service—M-16 rifles and the like—may be banned[.]" *Id.* at 627. That is because the amendment protects only "instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. States may prohibit "the carrying of 'dangerous and unusual weapons[.]'" *Id.* at 2128.

The *Bruen* court also clarified the text-and-history framework for analyzing whether the right recognized in *Heller* has been violated. Before *Bruen*, many courts applied a two-step means-end framework. In *Bruen*, the Court set forth a different two-step inquiry:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* In other words, Plaintiffs bear the burden to show that "the Second Amendment's plain text covers [their proposed] conduct" and thus "presumptively protects that conduct." *Id.*; *see also id.* at 2141 n.11 ("*[B]ecause* the Second Amendment's bare text covers petitioners' public carry, *the respondents here shoulder the burden* of demonstrating that New York's proper-cause requirement is consistent with the Second Amendment's text and historical scope.") (emphasis added); *Baird v. Bonta*, No. 19-cv-617, 2022 WL 17542432, at *6 (E.D. Cal. Dec. 8, 2022) (analyzing which party bears the burden of proof and concluding plaintiffs initially "must show they are likely to prove 'the Second Amendment's plain text covers' conduct regulated by" the law challenged before the state must justify its regulation). If Plaintiffs meet their burden, Defendants must then

show that the regulation aligns with historical tradition, *Bruen*, 142 S. Ct. at 2129–30, either by identifying historical regulations that are "distinctly similar" to the challenged regulation, *id.* at 2131, or by demonstrating that the regulation is analogous to historical regulations, *id.* at 2132.

*Bruen* did not wipe out every Second Amendment precedent. Courts have not always relied on means-end analysis to reject claims, and those decisions remain relevant. For example, in *Hollis v. Lynch*, 827 F.3d 436, 446–47 (5th Cir. 2016), the Fifth Circuit found machine guns are not covered by the text of the Second Amendment. Similarly, in *Kolbe v. Hogan*, 849 F.3d 114, 121 (4th Cir. 2017), the Fourth Circuit upheld a ban on assault weapons by applying *Heller* to conclude that the prohibited weapons were among those arms not protected by the amendment's text.[13] The result in *Kolbe* was not an outlier. Prior to *Bruen*, at least seven federal appellate courts upheld restrictions on assault weapons and/or LCMs. *Kolbe*, 849 F.3d at 130, 140; *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021) (en banc); *Worman v. Healey*, 922 F.3d 26, 30, 40 (1st Cir. 2019); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 122 (3d Cir. 2018) ("*ANJRPC*"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 263–64 (2d Cir. 2015); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1264 (D.C. Cir. 2011); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015); *Wilson v. Cook Cnty.*, 937 F.3d 1028, 1032–33 (7th Cir. 2019). Many of these decisions used the means-end scrutiny later criticized in *Bruen*, while the Seventh Circuit used a different framework.

Twice—in 2015 and again in 2019—the Seventh Circuit upheld local ordinances in Illinois that banned the sale and possession of assault weapons and large capacity magazines.[14] *Friedman*,

---

[13] *Bruen* abrogated *Kolbe*'s use of intermediate scrutiny, but *Kolbe* independently held that assault weapons and LCMs are excluded from the amendment's text. *Kolbe*, 829 F.3d at 121 (explaining that the court merely found it "prudent" to also conduct intermediate scrutiny analysis). The independently dispositive text-based ruling in *Kolbe* is consistent with *Bruen*'s first step and remains good law.

[14] Similar to the Act, the ordinances challenged in *Friedman* and *Wilson* adopted a two-fold definition of assault weapons: identifying specific weapons by name (e.g., AR-15 and AK-47 rifles) and also listing

784 F.3d 406; *Wilson*, 937 F.3d 1028. In *Friedman*, the court relied primarily on text and history to reject a Second Amendment challenge. In *Wilson*, plaintiffs asked the Seventh Circuit to overrule *Friedman*. The *Wilson* court refused and again rejected a Second Amendment challenge to a ban on the sale or possession of assault weapons and large capacity magazines.

In sum, after *Heller*, seven federal appellate courts upheld assault weapons and/or large capacity magazine restrictions when faced with Second Amendment challenges. The Seventh Circuit has rejected challenges to these types of laws *twice* in the past decade. While *Bruen* clarified the analytical framework courts should be using, it did not say the ultimate conclusions of those courts were wrong. They were not. *Bruen* permits assault weapons and LCM restrictions like those in the Act because they regulate weapons and accessories not commonly used for individual self-defense. And under *Bruen*'s "history and tradition" step, regulations like the Act also are consistent with our Nation's tradition of regulating "dangerous and unusual" weapons.

### B. Plaintiffs cannot show that the Act regulates conduct protected by the text of the Second Amendment.

To succeed on their claims, Plaintiffs must demonstrate the Act regulates conduct protected by the amendment's text. Plaintiffs cannot meet this burden in two primary respects. First, the "arms" protected by the Second Amendment do not include non-essential accessories like LCMs. Firearms are fully capable of providing self-defense with the 15- and 10-round magazines permitted by the Act. Second, assault weapons restricted by the Act are not protected "arms" because "arms" do not include "weapons that are most useful in military service—M-16 rifles and the like," *Heller*, 554 U.S. at 627. The Second Amendment protects only arms in common use at

---

features that, individually or in combination, made specific firearms assault weapons. *See Friedman*, 784 F.3d at 407; *Wilson*, 937 F.3d at 1029. The ordinances defined LCMs as those that can accept more than 10 rounds. *Friedman*, 784 F.3d at 407; *Wilson*, 937 F.3d at 1029.

the time the Second or Fourteenth Amendments were ratified, or those commonly used for self-defense today. *Id.*; *McDonald*, 561 U.S. at 750. Plaintiffs cannot show the Act violates the Second Amendment because it regulates weapons designed for war, not self-defense.

### 1. Large capacity magazines are not "arms."

To satisfy *Bruen*'s first step, Plaintiffs must prove both that the regulated instrument, device, or weapon fits within the category of "bearable arms," *id.* at 2132, and that it is "commonly used" for self-defense purposes, *id.* at 2138. Because LCMs are accessories, not arms, they fall outside the text of the Second Amendment.

The term "arms" refers to weapons and excludes accessories like ammunition magazines. *See Heller*, 554 U.S. at 581 (citing 1773 edition of dictionary defining "arms" as "[w]eapons of offence, or armour of defence")). Although LCMs can be used alongside weapons, they are not themselves weapons with offensive or defensive uses. Ex. 6, Busse Decl. ¶ 22 ("Magazines are containers which hold ammunition in spring-loaded preparation for feeding into the receiver of a firearm."); Ex. 7, Baron Decl. ¶ 57. *See Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246, 2022 WL 17721175, at *11 (D.R.I. Dec. 14, 2022) ("LCMs, like other accessories to weapons, are not used in a way that 'cast[s] at or strike[s] another.'") (quoting *Heller*).

This distinction was understood at the time the Bill of Rights was ratified, as demonstrated by the common phrase "arms and accoutrements," which clearly distinguished weapons, on the one hand, from items like cartridge cases, boxes, scabbards, and flints on the other. Ex. 7, Baron Decl. ¶¶ 11–12. Such accessories are not protected by the text of the Second Amendment. *See, e.g.*, *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (holding that a silencer is unprotected because it is "a firearm accessory [and] not a weapon in itself" and thus "can't be a

'bearable arm' protected by the Second Amendment"); *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019) (same), *aff'd*, 26 F.4th 610 (4th Cir. 2022).

Although some courts have held that accessories may be protected, this ancillary right has been extended only to accessories *necessary* to operate firearms for self-defense. *See, e.g.*, *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[T]he right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them.") (cleaned up); *Cox*, 906 F.3d at 1196 (Hartz, J., concurring) (noting that the Tenth Circuit's holding that silencers are not protected arms did not extend to "items that are not themselves bearable arms but are necessary to the operation of a firearm (think ammunition)").

Even under other courts' more expansive construction, the Second Amendment's text excludes large capacity magazines because they are not necessary to operate firearms for any purpose, including self-defense. All firearms that can accept a detachable large capacity magazine can also accept a magazine that holds fewer rounds and work just as well. Ex. 6, Busse Decl. ¶ 25. In any event, handguns, the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629, are widely sold with magazines of 15 or fewer rounds (the threshold permitted by the Act), not the 30-round magazines for AR-15s that Plaintiffs want to re-brand as "standard." Compl. & Mem. ¶ 53 (copied from *Harrel* Compl. ¶ 58). *See* 720 ILCS 5/24-1.10(a)(new).

Plaintiffs make no attempt to show that large capacity magazines are critical for self-defense. Many highly effective handguns have magazines compliant with the Act's 15-round threshold. The Beretta M9 semi-automatic pistol, which continues to be a sidearm commonly issued by the U.S. military for self-defense, typically has a 15-round magazine. Ex. 9, Schreiber Decl. ¶ 19. Law enforcement officers patrolling neighborhoods with the most gun violence in

Illinois carry standard-duty firearms with magazines at or below the Act's 15-round threshold.[15] Many handguns popular with civilians also have magazines below the 15-round threshold.[16]

The 10-round threshold for rifle magazines is equally permissible. Rifles with 10-round magazines are fully functional for self-defense and other lawful purposes. Modern semi-automatic rifles that are designed, manufactured, and marketed as "hunting rifles" traditionally have an internal magazine capacity of fewer than 10 rounds depending on the caliber. *Id.* ¶ 91. Even for the AR- and AK-platform rifles that are often sold with a 30-round magazine, the manufacturers also offer an option to purchase 10-round and lower capacity magazines (sometimes called "compliant" magazines, referring to compliance with magazine capacity limits in other jurisdictions). Ex. 6, Busse Decl. ¶¶ 25–26; *see also* Ex. 8, Yurgealitis Decl. ¶ 93. A rifle does not need a magazine holding more than 10 rounds to be used for self-defense. Ex. 6, Busse Decl. ¶ 26.

In light of these facts, it is unsurprising that federal courts that have considered whether LCMs fall within the text of the Second Amendment since *Bruen* have found that they do not. *See Oregon Firearms Fed'n, Inc. v. Brown*, No. 22-cv-1815, 2022 WL 17454829 (D. Or. Dec. 6, 2022) (refusing to enjoin LCM ban); *Ocean State Tactical*, 2022 WL 17721175 (same). Because the LCMs regulated by the Act are not "arms", Plaintiffs' challenge to those regulations will fail.

---

[15] For example, handguns in the Beretta 92 series, which accept a 15-round magazine, are used as standard-duty weapons by the Chicago Police Department. *See* Chicago Police Dep't, U04-02-01, Uniform and Property, *Department Approved Handguns and Ammunition* (eff. July 21, 2021), §§ V(A), VI(A), available at https://directives.chicagopolice.org/#directive/public/6465. For officers who joined after 2014, "[t]he only authorized prescribed firearm, alternate prescribed firearm, and auxiliary firearm . . . for on-duty or off-duty use will be a striker-fired semiautomatic pistol chambered in 9mm Luger (Parabellum)." *Id.* § II(c). These pistols are available with standard magazines of 15, 10, or even 7 rounds—all below the Act's threshold for handgun magazines. Ex. 8, Yurgealitis Decl. ¶ 92.

[16] For example, the Model 1911, which was the accepted defensive sidearm of the U.S. military for decades and is still one of the most widely owned self-defense guns in the country, is built to accept a magazine of 8 rounds or less. Ex. 6, Busse Decl. ¶ 25. The Sig P938, which is fully functional with a 7- or 8-round magazine, is a widely popular handgun and acclaimed as one of the most effective self-defense firearms on the market. *Id.* The Sig P938's shorter magazine is not just sufficient, but advantageous, because it makes the firearm easier to carry. *Id.*; *see also* Ex. 8, Yurgealitis Decl. ¶ 108.

## 2. Neither large capacity magazines nor assault weapons were in common use when the Second and Fourteenth Amendments were ratified.

The Second Amendment protects "the sorts of weapons . . . 'in common use at the time'" the Bill of Rights was ratified in 1791. *Heller*, 554 U.S. at 627 (quoting *Miller*). In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held the Second Amendment is applicable to the states through the Fourteenth Amendment. As a result, how the right was understood in 1868, when the Fourteenth Amendment was ratified, is also relevant. *Ezell*, 651 F.3d at 702 ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."). *See also United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified).").

Plaintiffs have not shown that the assault weapons and large capacity magazines restricted by the Act were in common use in 1791 or 1868—they were not. Reliable multi-shot firearms did not appear in any appreciable numbers until after 1868. Even those weapons, the Colt revolver and the Winchester repeating rifle, could not come remotely close to the rate of fire and rapid reloadability of modern assault weapons paired with large capacity magazines.

The firearms owned in the Founding Era generally could shoot only a single shot before reloading. Approximately 50% to 60% of households in the Colonial and Founding Eras owned a working firearm, usually a musket or a fowling piece. Ex. 10, Roth Decl. ¶ 15. Both were muzzle-loading. *Id.* Muskets were larger, single-shot firearms used for militia service. *Id.* Loading a musket required the musket ball to be manually inserted into the open end of the gun barrel and ramrodded into position. Fowling pieces were made to hunt birds and control vermin, using shot as ammunition instead of a ball. *Id.* With the exception of a few double-barreled pistols, neither

16

muskets nor fowling pieces could fire multiple shots without a time-consuming reloading process. *Id.* ¶ 16. Most owners stored guns empty because the powder to operate them absorbed moisture and could corrode the barrel or firing mechanism or make the gun vulnerable to misfire. *Id.*

Single-shot, muzzle-loading firearms remained the standard infantry weapon up to and including the Civil War. Ex. 11, Spitzer Decl. ¶ 44. Even as technology advanced to improve the reliability of multi-shot weapons, adoption of these weapons was slow. The first practical firearm that could shoot more than one bullet without reloading was a handgun designed by Samuel Colt in the 1830s with a revolving cylinder carrying multiple rounds (a "revolver"). *Id.* ¶ 45. But Colt struggled to find a market for his revolver, either from the government or the public. *Id.* The U.S. government repeatedly rejected the weapon after tests in 1836, 1837, 1840, and 1850, driving Colt to bankruptcy at one point. *Id.* The official sidearm of the U.S. Army in the Civil War was a single-shot pistol. *Id.* It was only after the Civil War that the Colt-type revolver began to broadly proliferate in American society. *Id.*; *accord Caetano v. Massachusetts*, 577 U.S. 411, 416 ("Revolvers were virtually unknown well into the 19th century, and semiautomatic pistols were not invented until near the end of that century.") (Alito, J., concurring). Even so, the vast majority of revolvers produced in the 19th century held 7 or fewer rounds. Ex. 12, Delay Decl. ¶ 53. Reloading a revolver requires the cylinder to be unlocked from the frame and swung out for the user to remove expended casings and insert unfired rounds. *Id.* ¶ 54; Ex. 8, Yurgealitis Decl. ¶ 9.

Reliable rifles capable of firing more than one round without reloading did not appear in significant numbers until after the Civil War, and even then there were significant limitations compared to modern assault weapons. Benjamin Henry patented a rifle that could fire multiple rounds (through the use of a lever action) in 1860. Ex. 11, Spitzer Decl. ¶ 46. The Winchester Arms Company built on this design to introduce a repeating rifle in 1866 that could fire up to 16

rounds (1 in the chamber plus 15 in an attached, tubular magazine). Ex. 12, Delay Decl. ¶ 58. It was not, however, a semiautomatic rifle; the shooter had to manipulate a lever in a forward-and-back motion before each shot. Ex. 11, Spitzer Decl. ¶ 46. Reloading a lever-action Winchester rifle was also significantly slower than changing the magazine on a modern firearm. The user had to manually reload one round at a time. *Id.*; Ex. 12, Delay Decl. ¶ 64. Between 1861 and 1871—the decade spanning the Civil War and the ratification of the Fourteenth Amendment—there were 31 to 38 million Americans but only 74,000 repeating rifles produced in the aggregate by the Henry and Winchester companies.[17] Ex. 11, Spitzer Decl. ¶ 46; Ex. 12, Delay Decl. ¶ 59.

Practically speaking, these were the only firearms in circulation at the time the Fourteenth Amendment was ratified in 1868 that could fire more than 10 rounds without reloading.[18] Ex. 12, Delay Decl. ¶ 58. And there were not many of them compared to other types of firearms. As one prominent historian put it: "Rifles holding more than 10 rounds made up a tiny fraction of all firearms in the United States during Reconstruction." Ex. 11, Spitzer Decl. ¶ 46 (quoting historian Michael Vorenberg). One estimate puts this figure at 0.002% of all firearms in the United States by 1872. Ex. 12, Delay Decl. ¶ 60. In other words, firearms with magazines or magazine capacities like those restricted by the Act were not in common use in 1791 or 1868.

Plaintiffs elide this fact and offer a misleading allegation that "firearms capable of firing more than ten rounds without reloading have existed at least since the late 16th century." Compl. ¶ 57 (copied from *Harrel* Compl. ¶ 67). But this does not show these firearms were commonly owned, and certainly not in "common use" for self-defense. Limited or experimental use is not

---

[17] Just prior to the production of these Winchesters, the population of the United States was 31,443,321. U.S. Census Bureau, "1860 Fast Facts," https://bit.ly/3Z4TLgL. By 1871, the population had risen to 38,558,371. U.S. Census Bureau, "1870 Fast Facts," https://bit.ly/41xeP16.
[18] Lever-action repeating rifles like the Winchester 1873 are not restricted by the Act. The Act defines "assault weapon" to not include a "firearm that is manually operated by bolt, pump, lever or slide action, unless the firearm is a shotgun with a revolving cylinder." 720 ILCS 5/24-1.9(a)(2)(C) (new).

"common use," and the former is all Plaintiffs can allege. As one of Defendants' historian experts,

Professor Brian Delay, lays out in his declaration, the multi-shot weapons Plaintiffs reference:

> were flawed, experimental curiosities prior to the founding of the United States.
> They were both dangerous (to the shooter, as well as to the target) and highly
> unusual. Most of these weapons never advanced beyond proof of concept. Only a
> small minority of large-capacity firearm inventions ever moved past the design or
> prototype stage, and none achieved commercial success or military relevance prior
> to 1791.

Ex. 12, Delay Decl. ¶ 8. That is why Plaintiffs point to no evidence of these weapons—which

would have been game-changing battlefield innovations in the frequently fought-over regions of

18th and 19th century Europe and North America if they were actually reliable—achieving

widespread adoption in either a military or civilian setting. *Id.* ¶¶ 8–10. If George Washington,[19]

Napoleon Bonaparte, or Ulysses S. Grant never found use for these "exotic curios" amid their

bloody conflicts, then it is hard—indeed, impossible—to conclude they were in "common use"

among civilians before 1791 or even 1868. *See id.* ¶ 31.

### 3. The Act restricts weapons and accessories not commonly used for self-defense today.

The Act restricts weapons and accessories that are not commonly used by Americans for

self-defense today. As explained *supra*, LCMs provide a round-capacity in excess of what is

necessary for self-defense. Assault weapons similarly enable a degree of lethality appropriate for

the battlefield, but unnecessary for individual self-defense. Because assault weapons are not

commonly used for the purpose of self-defense, they are not "arms" protected by the Second

Amendment. *McDonald*, 561 U.S. at 749–50; *Bruen*, 142 S. Ct. at 2134.

---

[19] Plaintiffs note that "[i]n 1777, Joseph Belton demonstrated a repeating rifle that could hold 16 rounds of ammunition to members of the Continental Congress." Compl. ¶ 58 (copied from *Harrel* Compl. ¶ 69). But demonstration is not adoption and certainly not "common use." Congress ordered a total of 100 of Belton's weapons, only to cancel the order days later and never revisit it. *See* Ex. 12, Delay Decl. ¶¶ 21–22. Multi-shot firearms were no more in common use at the Founding than personal jetpacks are today.

In *Heller*, the Supreme Court made clear that the Second Amendment should be interpreted to extend beyond weapons in common use in the past to protect arms commonly used today for "self-defense in the home." *Heller*, 554 U.S. at 636. The Supreme Court has reaffirmed in cases since that the individual right to bear arms protects arms commonly used today for the purpose of self-defense. *See Bruen*, 142 S. Ct. at 2143 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self defense today.") (citation omitted); *McDonald*, 561 U.S. at 749–50 ("the Second Amendment protects the right to keep and bear arms for the purpose of self-defense").

Meanwhile, the Supreme Court has consistently recognized that individuals' self-defense rights can coexist with prohibitions on specific types of weapons. For example, in *Heller*, the court observed that the National Firearms Act of 1934 permissibly restricted machine guns because at the time they were not commonly being used by civilians for self-defense. 554 U.S. at 624–25. And the Court emphasized that today "weapons that are most useful in military service—M-16 rifles and the like—may be banned[.]" *Id*. at 627. The assault weapons restricted by the Act are not protected by the Second Amendment because, like M-16 rifles, they are "most useful in military service," not civilian self-defense. *Heller*, 554 U.S. at 627.

### a. The restricted weapons are for war—not individual self-defense.

According to Plaintiffs, the largest number of firearms impacted by the Act are likely AR-15 rifles. In an effort to meet their burden under *Bruen*'s first step, Plaintiffs cite statistics about ownership of AR-15s. Compl. ¶¶ 28–29 (copied from *Harrel* Compl. ¶¶ 35–36). Like the other assault weapons covered by the Act,[20] AR-15 rifles were designed and built for soldiers on the battlefield; they have no place in American communities.

---

[20] Like the AR-15, other specific models of assault weapons in the Act are of military origin. Many were designed to mimic and build upon features from the German StG 44, considered the first "assault weapon"

The AR-15 models in circulation today trace their origin to a rifle designed by the ArmaLite (the "A" in "AR") Corporation in 1956.[21] Compl. ¶ 27; Ex. 8, Yurgealitis Decl. ¶¶ 58–60; Ex. 5, Andrew Decl. ¶ 25; Ex. 10, Roth Decl. ¶ 49 n.112. Responding to the Soviet-designed rifle that first appeared in 1947, the AK-47, ArmaLite's design closely followed what was emerging as standard assault rifle design in the post-World War II era: light-weight construction using aluminum where possible in lieu of machined steel; separate pistol grip and shoulder stock; a foregrip and/or barrel shroud; a detachable magazine; and flash hider or muzzle brake variations. Ex. 10, Roth Decl. ¶ 49; Ex. 8, Yurgealitis Decl. ¶¶ 52–53, 58–60; *compare* 720 ILCS 5/24-1.9(a)(1)(A)(new). In 1961, the U.S. Department of Defense purchased 1,000 AR-15 rifles. Ex. 8, Yurgealitis Decl. ¶¶ 59–60; Ex. 5, Andrew Decl. ¶ 25; Ex. 10, Roth Decl. ¶ 49 n.112. The U.S. Army subsequently shipped them to Vietnam that same year for testing during live combat. Ex. 5, Andrew Decl. ¶¶ 25–26; Ex. 8, Yurgealitis Decl. ¶ 59.

A declassified field test report prepared by the Department of Defense in 1962 detailed just how lethally potent the AR-15 proved as a weapon of war. Ex. 5, Andrew Decl., Ex. B. Describing the wounds to 5 Viet Cong soldiers killed by AR-15 rounds, the report noted in grisly detail:

- One sustained a "[b]ack wound, which caused the thoracic cavity to explode";
- Another sustained a "[s]tomach wound, which caused the thoracic cavity to explode";
- A third sustained a "[b]uttock wound, which destroyed all tissue of both buttocks";
- A fourth sustained a chest wound that "destroyed the thoracic cavity";
- The fifth sustained a heel wound that caused "the leg to split from the foot to the hip."

---

or "assault rifle," which appeared in production late in World War II. Ex. 8, Yurgealitis Decl. ¶¶ 40–60.
[21] The U.S. military tested the first hydrogen bomb, the thermonuclear warhead that would loom large for the Cold War, in 1952—four years before the AR-15 first appeared. Ex. 10, Roth Decl. ¶ 49 n.112.

*Id.* ¶ 27 (quoting Ex. B). All of the deaths "were instantaneous except the buttock wound. He lived approximately five minutes." *Id.*; *see also id.* ¶¶ 28–32. The "phenomenal lethality" of the AR-15 described in the field report led the U.S. Army to adopt it as a combat rifle in December 1963. *Id.* ¶ 32; Ex. 8, Yurgealitis Decl. ¶ 60. As part of its adoption, the Army gave the AR-15 a new name: the M-16—the weapon identified by the *Heller* court as the type of weapon that can be banned for civilian use. Ex. 8, Yurgealitis Decl. ¶ 59; *Heller*, 128 S. Ct. at 2816.

The features that made the AR-15 phenomenally lethal in the jungles of Vietnam make it equally lethal in in our Nation's classrooms and communities. The muzzle velocity of an AR-15 with standard ammunition, when adopted by the military and now, is approximately 3200 feet per second—nearly three times the speed of sound. Ex. 8, Yurgealitis Decl. ¶ 61; Ex. 9, Schreiber Decl. ¶ 21; Ex. 13, Hargarten Decl. ¶¶ 13–15, 31–32; Ex. 5, Andrew Decl. ¶ 34. By contrast, a 9-millimeter Beretta (like those carried by law enforcement) has a muzzle velocity of around 1100–1200 feet per second. Ex. 9, Schreiber Decl. ¶ 21; Ex. 8, Yurgealitis Decl. ¶ 60. This nearly three-fold difference means that the kinetic energy generated by the impact of an AR-15 round is 1303 foot pounds, compared to 400 foot pounds for a 9-millimeter Beretta. Ex. 9, Schreiber Decl. ¶ 22.

The massive amount of energy delivered by each AR-15 round is what caused the "thoracic cavit[ies]" of multiple soldiers "to explode" as described in the military's 1962 field report. Ex. 5, Andrew Decl. ¶¶ 27, 30; Ex. 9, Schreiber Decl. ¶¶ 22, 35 ("Inside a human body, one assault weapon round can destroy organs in a way that looks like an explosion has happened."). The AR-15's immense capacity to inflict catastrophic injury is equally evident today in combat hospitals, emergency rooms, and laboratories. Ex. 9, Schreiber Decl. ¶ 33 ("The assault weapon wounds that I have seen in a civilian context are virtually identical in nature to the wounds that I saw in combat.") A bullet entering the body creates a temporary and, eventually, permanent cavity;

holding all else equal, the larger the cavity, the more severe the injury. *Id.* ¶ 23. Because of their mass, velocity, and resulting kinetic energy, AR-15 rounds produce larger cavities, with devastating effects to tissue and surrounding organs. *Id.* ¶ 24; Ex. 13, Hargarten Decl. ¶¶ 23–30 & Ex. B. Laboratory tests confirm that a 5.56-millimeter AR-15 round inflicts temporary cavities in simulated human tissue that are "significantly larger than the cavity sizes caused by handguns, [the] Thompson Machine, and [a] musket." Ex. 13, Hargarten Decl. ¶ 27. Testing shows that the energy released by an AR-15 round dwarfs that of handguns, Thompsons, and muskets. *Id.* ¶ 26.

Assault weapon rounds also are more likely to injure multiple organs and kill children. Assault weapon rounds tend to cause victims to suffer multiple organ injuries, increasing their lethality compared to handgun rounds. Ex. 9, Schreiber Decl. ¶¶ 35–41. As one leading trauma surgeon and retired Navy captain put it in describing AR-15 wounds: "[I]t's as if you shot somebody with a Coke can." Ex. 5, Andrew Decl. ¶ 34 (quoting Dr. Pete Rhee). The impact is especially catastrophic for children: the relative proximity of vital organs to each other in children's smaller bodies increases the likelihood of serious injury or death. Ex. 13, Hargarten Decl. ¶¶ 32, 34–35. The grim reality of school shootings bears this out. At Sandy Hook Elementary School, twenty 6- and 7-year-olds were shot with an AR-15. None survived. *Id.* ¶ 35.

In addition to the catastrophic impact of each individual round, the rate of fire enabled by assault weapons makes them lethal weapons of war, especially when used with LCMs. For example, a semi-automatic AR-15 equipped with a 30-round magazine is capable of firing substantially more rounds per minute than a bolt-action Remington hunting rifle with a magazine of three to five rounds. *Id.* ¶ 28. Even though laboratory tests indicate that the energy delivered by a single Remington round comes close to what a single AR-15 round imparts, the rapid rate of fire enabled by the AR-15's semi-automatic reloading means that the AR-15 releases significantly

more energy on a per-minute basis than the hunting rifle. *Id.* The magazine size—30 rounds versus 3 to 5—also drastically reduces the frequency of reloading needed for the AR-15 compared to the hunting rifle. *Id.* Because of its rate of fire, an AR-15-style weapon is capable of causing massive destruction at a speed not possible with a hunting rifle. *Id.* ¶ 29. This vastly differential killing capability is why Remington's hunting rifles are permitted under the Act, but AR-15s and similar assault weapons are not.

Plaintiffs downplay the capabilities of assault weapons subject to the Act by differentiating between semi-automatic and automatic fire. Compl. ¶ 32 (copied from *Harrel* Compl. ¶ 38). They attempt to cast the AR-15s available to civilians as tame by contrasting them with automatic machine guns used by the military that fire between 750-6000 rounds a minute. *Id.* These allegations are misleading and beside the point. While it is true that automatic firearms generally have a higher rate of fire than semi-automatic firearms, the carnage a firearm inflicts depends on the number of rounds that hit intended targets. Assault weapons combine a high rate of fire *and* continued accuracy—that combination is what makes them so lethal. *See* Ex. 6, Busse Decl. ¶¶ 23, 34; Ex. 13, Hargarten Decl. ¶ 14 n.5 (noting that assault weapons enable rounds to be fired at "high velocity," "a high rate of delivery," and "a high degree of accuracy at long range"); *accord* Ex. 5, Andrew Decl. ¶ 20 n.4. The U.S. Army understands this fact. The Army's 2008 Field Manual for the M-16—which, unlike its civilian AR-15 counterparts, enables both automatic and semi-automatic fire—stressed that semi-automatic fire is the "'most important firing technique during fast-moving, modern combat,'" and further noted that "'[i]t is surprising how devastatingly accurate rapid semi-automatic fire can be.'" Ex. 5, Andrew Decl. ¶ 33. This is why U.S. Special Forces trainers also teach that semi-automatic fire is the preferred and most lethal setting in most wartime scenarios. Ex. 6, Busse Decl. ¶ 34.

The nexus between rate of fire and lethal accuracy is why the Act, in defining "assault weapon[s]" subject to its restrictions, zeroes in on firearm features enabling a shooter to maintain lethal accuracy while discharging a high number of rounds in a short time. *See* 720 ILCS 5/24-1.9(a)(1)(A)-(C). The Act defines assault weapons in relevant part as semiautomatic rifles or pistols with one or more features like: "a protruding grip," "a flash suppressor," a "pistol grip or thumbhole stock," a "folding" or "telescoping" stock, or a "shroud" on the barrel that allows the "bearer to hold the firearm with the non-trigger hand without being burned," *id.* §§ 1.9(a)(1)(A)(i)-(iv), (vi) & 1.9(a)(1)(B)(ii)-(iv). *See also* Ex. 3, Demuth Decl., Ex. A (providing examples). These features facilitate greater sustained accuracy when shooting multiple rounds in quick succession:

- Thumbhole stocks and pistol grips allow a shooter to control and aim a rifle during periods of rapid fire. Ex. 6, Busse Decl. ¶¶ 13, 14.

- A protruding or second grip is also designed to keep a firearm stable during rapid firing. Ex. 6, Busse Decl. ¶ 15; Ex. 8, Yurgealitis Decl. ¶ 81. This additional grip allows shooters to better control the muzzle during firing and can help keep the rifle stable during magazine changes, which can reduce reloading time. Ex. 6, Busse ¶ 15. Forward grips first gained prominence among special operations and other military units. *Id.*

- Flash suppressors are added to the end of a firearm to direct the gas produced from firing in directions that result in reduced recoil and muzzle rise, allowing the shooter to stay on target in extended rapid-fire situations. Ex. 6, Busse Decl. ¶ 17. By reducing muzzle flash, they help conceal a shooter's location (e.g., from enemies in war, or from law enforcement in domestic use), and allow a shooter to more easily acquire additional targets in low light conditions without having to wait for their vision to adjust. Ex. 8, Yurgealitis Decl. ¶ 84.

- A barrel shroud enables a shooter to stabilize a rifle with the non-trigger hand without getting burned by the barrel heat generated during rapid fire. Ex. 6, Busse Decl. ¶ 19.

In short, the design objective of each of the restricted features is to enable a shooter to stay on target—to be more lethal—while firing large amounts of ammunition in quick succession.

The Act's two-fold approach to defining assault weapons—identifying features and listing specific models—is not novel. The federal assault weapons law in effect from 1994 through 2004 adopted a similar features-based definition, which it also combined, like the Act, with a list of

25

specifically covered models. *See* Pub. L. No. 103-322, § 110102, 108 Stat. 1796 (amending 18 U.S.C. § 921(a)). For both the expired federal law and the Act, the features covered are not necessary "for the purpose of self-defense." *McDonald*, 561 U.S. at 750. Instead, their purpose is primarily to facilitate lethal accuracy during rapid fire. While these features are "useful in military service," they are unnecessary for civilian self-defense. *Heller*, 554 U.S. at 627. On the other hand, because of the accuracy-enhancing features in modern assault weapons, mass shooters who use them do not require a high level of firearms training or practice to inflict mass death and injury at both close and extended ranges. Ex. 5, Andrew Decl. ¶¶ 41–42. Faced with this reality, the Illinois General Assembly had ample reason to restrict access to these weapons of war.

### b. Sales and ownership numbers do not show commonality or use.

In support of their motion, Plaintiffs offer no evidence establishing the restricted weapons are commonly used for self-defense. Plaintiffs instead allege that millions of Americans "have owned" AR-15 riles at some point, and some of those who do report in surveys that they own them for self-defense. Compl. ¶¶ 28, 32 (copied from *Harrel* Compl. ¶¶ 35, 39). Neither allegation is sufficient to show "common use" for self-defense and, by extension, coverage by the Second Amendment. *See McDonald*, 561 U.S. at 749–50; *Bruen*, 142 S. Ct. at 2134.

*Heller* held and *McDonald* reaffirmed that "that the Second Amendment protects the right to keep and bear arms *for the purpose of self-defense*." *McDonald*, 561 U.S. at 749–50 (emphasis added). Ownership statistics prove nothing about how AR-15s are commonly used. It would be circular for courts to determine the constitutionality of a restriction on weapons by whether the market had been flooded with them yet. *See Friedman*, 784 F.3d at 409 ("It would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned."); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat

illogical"). *Heller* confirms that the question is how weapons are being used. In discussing the machineguns and sawed-off shotguns regulated by the National Firearms Act of 1934, *Heller* took it as a given that these were not the "types of weapons" protected by the Second Amendment. 554 U.S. at 623. Regardless of their prevalence in the 1920s and 1930s, which *Heller* did not bother to assess, they could be banned because they were not weapons "typically possessed by law-abiding citizens *for lawful purposes*," *id.* at 624–25 (citing *Miller*, 307 U.S. 174).

Plaintiffs have not shown the assault weapons covered by the Act are commonly owned, let alone used, for self-defense. Two categories of weapons already recognized by the Supreme Court as weapons commonly used for self-defense, modern handguns and Colonial Era muskets, provide a useful threshold for comparison. Handguns, the "quintessential self-defense weapon" in modern America, *Heller*, 554 U.S. at 629, are vastly more common than the AR-15 rifles Plaintiffs focus on. According to data from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), handguns represent 50% of all firearms in civilian circulation in the United States. Ex. 4, Klarevas Decl. ¶ 28 & Fig. 14. By contrast, according to Plaintiffs' own figures, AR-15s make up only 5.3% of the firearms in civilian circulation. *Id.* ¶ 27. Plaintiffs tout that "over 24 million AR-15 or similar rifles have been produced for the U.S. market," Compl. ¶ 28 (copied from *Harrel* Compl. ¶ 35)—but there are an estimated 461.9 million firearms in circulation in American society. Ex. 4, Klarevas Decl. ¶ 27. This means there are more than 18 firearms that are not AR-15s for every AR-15 in civilian circulation.

Even the vast majority of gun-owners in the United States do not own an AR-15. Out of the 81 million Americans who own at least one firearm, only 6.4 million (or 8%) own "modern sporting rifles"—the term the firearms industry uses to euphemize assault weapons. Ex. 4, Klarevas Decl. ¶¶ 13, 27. Only 2% of Americans own a "modern sporting rifle" based on the

27

current U.S. population of 333 million people. *Id*. ¶ 27. This 2% figure is dwarfed by the 50% to 60% of colonial Americans who, according to historians, owned a musket, fowling piece, or other firearm. Ex. 10, Roth Decl. ¶ 15. Whether modern or historical reference points are considered, Plaintiffs' allegations that assault weapons are in "common use" do not hold up to scrutiny.

Plaintiffs' own sources confirm that assault weapons are not commonly *used* for self-defense. First, the research paper cited by Plaintiffs found that handguns—not assault weapons—accounted for a large majority of defensive uses of firearms.[22] According to the research Plaintiffs cite, only 13% of incidents of self-defense with guns involve rifles of any kind. *Id.* And because the paper does not distinguish among types or features of rifles used for self-defense, it is unclear whether *any* of this 13% includes weapons that are restricted by the Act. *Id.* The paper also found that in more than 80% of cases where guns are used defensively, no shots are fired at all, *id.* at 13–14, refuting Plaintiffs' allegations that large capacity magazines are needed for self-defense.

Plaintiffs also cite a small consumer survey paid for by a gun industry trade association. Compl. ¶ 34 (copied from *Harrel* Compl. ¶ 39) (citing Nat'l Sports Shooting Found., *Modern Sporting Rifle: Comprehensive Consumer Report* (July 14, 2022) available at https://bit.ly/3SSrVjM)). This survey has no validity: not only does it expressly acknowledge that its results are potentially inaccurate, but the survey respondents do not appear to have been randomly selected, and the stated purpose of the survey was to sway opinion on gun rights. *Id.* at 2, 10. Page 18 of the survey appears to be the basis for Plaintiffs' allegation about why some current owners want assault weapons, but even that slide shows respondents rated recreational target shooting as a more important reason. And the fact that a non-representative group of current gun owners stated that they believe that their assault weapons are more important for self-defense

---

[22] William English, *2021 Nat'l Firearms Survey: Updated Analysis* (May 2022), at 10–11 (cited at Compl. ¶¶ 28, 33 (copied from *Harrel* Compl. ¶¶ 35, 39)).

than for "collecting" or "varmint hunting" does not show that assault weapons are actually *used* for that purpose. Quite the opposite: the survey did not identify any respondents who used assault weapons for self-defense in the past twelve months. *Id.* at 43 (showing that individual self-defense was not among the nine kinds of uses reported by survey respondents).

In sum, the Act does not deprive Illinois residents of weapons in common use for self-defense. Rather, it limits access to a category of weapons designed to inflict "'phenomenal lethality'" on the battlefield, because those weapons are turning our streets, schools, and offices into combat zones. Ex. 5, Andrew Decl. ¶ 32. From 1991 to 2022, there were 93 mass shootings in our country where 6 or more victims died. Ex. 4, Klarevas, Ex. C. Out of the high-fatality mass shootings occurring in the last 8 years, half—50%—have been perpetrated with assault weapons; and 76% involved large capacity magazines. Ex. 4, Klarevas Decl. ¶ 12, Figs. 3 & 4. On the other hand, the Federal Bureau of Investigation ("FBI") has documented 406 active shooter incidents around the country since 2000; in all those tragedies, there has only been a single instance—one—where a civilian used an assault rifle defensively to stop an active shooter. Ex. 4, Klarevas Decl. ¶ 25. To put it bluntly, assault weapons in civilian hands are killing us, not protecting us.

### C. Even if Plaintiffs meet their textual burden, history and tradition allow regulating these weapons and accessories.

The Act not only does not burden conduct covered by the plain text of the Second Amendment, but it also fits well within the long-standing historical tradition of regulating "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2129–30. In other words, Plaintiffs' claims are independently likely to fail at *Bruen*'s second step if the Court reaches it.

*Bruen*'s second step allows regulations of conduct covered by the Second Amendment when the government can show those regulations are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. Our country has a "historical tradition of prohibiting

the carrying of 'dangerous and unusual weapons'"—a tradition derived from English law pre-dating the Founding and subsequently incorporated into American law. *Heller*, 554 U.S. at 627 (quoting 4 W. Blackstone, *Commentaries on the Laws of England* 148–49 (1769)). *Bruen* confirmed this tradition. 142 S. Ct. at 2132; *see also id.* at 2162 (Kavanaugh, J., concurring) ("[N]othing . . . should be taken to cast doubt on . . . the historical tradition of prohibiting the carrying of dangerous and unusual weapons."). To demonstrate that the Act is consistent with this historical tradition, the State may use "analogical reasoning" to identify historical regulations that are "relevantly similar" to the Act. *Id.* at 2133. The State's burden is to identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* The Act need not be "a dead ringer for historical precursors" to "pass constitutional muster." *Id.*

To determine whether the historical regulations identified are relevantly similar to the Act, this Court must consider "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2133. These "how and why" considerations look to "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. In some cases, the historical inquiry is "fairly straightforward," such as when a challenged regulation addresses a "general societal problem that has persisted since the 18th century." *Id.* at 2131. But other cases require "a more nuanced approach," particularly cases "implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 2132.

The Act adheres to the tradition of regulating dangerous and unusual weapons. Its restrictions on acquiring assault weapons and LCMs share common purpose with historical regulations targeting weapons especially disruptive and harmful to public order and safety. *See Bruen*, 142 S. Ct. at 2133 (considering "why" historically analogous regulations were enacted).

30

The Act does so in a manner that imposes no more burden than comparable historical regulations. *See id.* (considering "how" historically analogous regulations burdened "a law abiding-citizen's right to self-defense"). Americans in prior eras subject to comparable regulations maintained the right to keep and carry muskets or rifles for self-defense, even as laws in several states restricted weapons associated with public violence and criminality—concealable pistols, Bowie knives, clubs, and, later, machine guns and semi-automatic weapons. The same is true here. Law-abiding Illinois residents retain access to many firearms for self-defense, including handguns with 15-round magazines, rifles with 10-round magazines, and shotguns. Because the Act regulates "dangerous and unusual weapons" for a purpose and in a manner relevantly similar to comparable historical regulations, it does not violate the Second Amendment. *Id*. at 2129–30.

### 1. The Act responds to dramatic technological changes and unprecedented societal concerns.

*Bruen*'s "more nuanced approach" to "analogical reasoning" is appropriate in assessing the Act. 142 S. Ct. at 2132. The Act responds to "dramatic technological changes"—the emergence of modern assault weapons in the Cold War era—that have generated "unprecedented societal concerns"—mass-casualty shootings perpetrated by lone gunmen empowered by these weapons.

Assault weapons represent "dramatic technological changes" compared to weapons that existed in 1791 or 1868. As discussed *supra*, compared to the single-shot, muzzle-loading muskets of 1791, or the Colt revolvers or Winchester repeating rifles of 1868, assault weapons and LCMs regulated by the Act are different in kind across multiple dimensions: rate of fire, ease of reloading, power, range, sustained accuracy, and, ultimately, lethality. A musket, Colt revolver, or Winchester repeating rifle from 1868 or before simply had nowhere close to the accelerated re-loading capability that LCMs and assault weapons enable. The near-instantaneous swapping of a modern 30-round magazine is materially different than manually re-filling each chamber of a

revolver, individually inserting rounds into a repeating rifle, or loading a musket ball in half a minute. This difference has lethal implications: the Highland Park shooter could not have inflicted the same carnage in a minute with a musket, a Colt revolver, or a Winchester repeating rifle as he did with his AR-15 and 30-round magazines. The Act responds to dramatic technological changes.

These dramatic technological changes have wrought an "unprecedented societal concern": the ability of a single individual equipped with an assault weapon and large capacity magazines to murder dozens of people in a matter of minutes, if not seconds. *Id.* The sharply increasing frequency and severity of mass shootings in this country confirms this is a new phenomenon. Before 1948, there were no mass shootings perpetrated by a single individual that resulted in double-digit fatalities. Ex. 4, Klarevas Decl. ¶ 18. The first known mass shooting resulting in 10 or more deaths occurred in 1949. *Id.* It took 17 years for another comparably lethal shooting to occur in 1966; 9 years passed before a third such shooting in 1975; and 7 years passed before a fourth occurred in 1983. *Id.* ¶ 19. But in recent years—and especially since the expiration of the federal assault weapons ban in 2004—the frequency and cumulative lethality of mass shootings has increased dramatically. The following graph plots high-fatality mass shootings by year, with the large cluster on the right side showing just how modern this phenomenon is:

**Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)**



*Id.*, Fig. 12. This demonstrates that mass shootings are a recent and "unprecedented societal

concern" made possible by "dramatic technological changes." *Bruen* therefore requires a "more nuanced approach" when comparing the Act to historical regulations. 142 S. Ct. at 2132.

> ### 2. There is a historical tradition of regulating dangerous and unusual weapons associated with increased criminality and violence.

The United States has a long historical tradition of regulating dangerous and unusual weapons. *See Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 627. There is an uninterrupted through line running from regulations of pistols and "fighting knives" in the 18th and 19th centuries, to revolvers in the latter half of the 19th century, to machine guns in the early 20th century, to assault weapons in the late 20th and early 21st centuries. In each era, our ancestors regulated specific categories of weapons when their proliferation coincided with escalating or novel forms of violence. The scope of the regulation increased commensurate with the increasing danger posed by new weapons technology—moving from concealed-carry prohibitions on single-shot pistols to outright possession bans on machine guns by the early 20th century. The purchase-and-sale and possession limitations Plaintiffs challenge in the Act are entirely consistent with this tradition.

> #### a. From the Founding Era through the 19th century, legislatures enacted categorical restrictions on dangerous and unusual weapons, including specific firearms.

The historical tradition of regulating dangerous and unusual weapons pre-dates the Founding. For example, Blackstone noted that "riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land[.]" 4 William Blackstone, *Commentaries* 148–49 (1769); *see Bruen* 142 S. Ct. at 2128 (citing Blackstone). Colonial lawmakers were explicit about specific categories of weapons they understood to be dangerous or unusual. For example, a 1686 New Jersey law restricted concealed carrying of "any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons." Ex. 14, Excerpts from Historical Regulations Cited, Table 1. Categorical restrictions on specific dangerous

33

or unusual weapons continued to emerge in the 18th century. Between 1750 and 1799, six states (or soon-to-be states) passed laws restricting the carrying of blunt weapons like clubs. Ex. 11, Spitzer Decl. ¶ 76 (citing Exhibit C). These laws were a response to the growing use of the regulated weapons by criminals and as fighting instruments. *Id*. ¶ 79.

The emergence of the Bowie knife and the widespread regulatory response to it illustrate how legislatures enacted categorical restrictions to attempt to tamp down on weapons-driven violence. The Bowie knife was invented in the 1820s and gained notoriety in the 1830s. Ex. 11, Spitzer Decl. ¶¶ 62–63. It was typically a large, single-edged knife with a cross guard and a blade with a clipped point. *Id*. ¶ 63. These characteristics made it a particularly effective "fighting knife," and the Bowie knife was widely used in fights and duels, especially when single-shot pistols were still unreliable and often inaccurate. *Id.*; Ex. 10, Roth Decl. ¶¶ 25, 30. Bowie knives and similar "fighting knives" could also be carried concealed. Ex. 10, Roth Decl. ¶ 24. Their concealability contributed to their criminal misuse: They were used to ambush, bully, and intimidate law-abiding citizens, and to seize the advantage in fist fights. *Id*. An 1834 plea by a grand jury in Jasper County, Georgia to the state's legislature summarizes the social harm these weapons caused:

> The practice which is common amongst us with the young[,] the middle aged[,] and the aged[,] to arm themselves with Pistols, dirk[,] knives[,] sticks[,] & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol[,] dirk[,] or club is immediately resorted to, hence we so often hear of the stabbing[,] shooting & murdering [of] so many of our citizens.

*Id*. These concerns were not unique to Georgia. Fighting knives and other concealed weapons drove criminal violence in many parts of the country to previously unknown levels. *Id*. ¶ 27.

Legislatures in the 19th century responded to this burgeoning violence with categorical restrictions on the Bowie knife and other "fighting knives." At least 38 states (or soon-to-be states) and the District of Columbia enacted restrictions on Bowie knives, often in conjunction with other

categories of "dangerous or unusual" weapons associated with violence (e.g., clubs, bludgeons, "slung shots"). Ex. 14, Table 2. This regulatory trend began in the 1830s when 6 states enacted laws barring carriage of the Bowie knife. *Id*. Other legislatures also targeted the Bowie knife, adopting different regulatory approaches as they saw fit: 15 states banned both open and concealed carry; 29 barred concealed carry; 4 taxed their commercial sale; 3 taxed ownership; 10 barred their sale to specific groups; and 4 punished brandishing them. Ex. 11, Spitzer Decl. ¶ 71 & Ex. H. Clearly, none of these 39 legislatures understood the Second Amendment to prohibit categorical restrictions on weapons that were driving new forms of violence.

The categorical regulation of Bowie knives parallels the regulatory response to another emergent weapon: concealable, percussion cap pistols. As early as the 17th century, pistols were categorically regulated. The 1686 New Jersey law referenced above expressly prohibited concealed carry of "pocket pistol[s]." Ex. 14, Table 1. Concern about the concealability of "pocket" pistols foreshadowed regulatory concerns in later eras. Firearms that could be concealed created new societal problems. For much of the Colonial and Founding Eras, the predominant firearms owned by Americans, muskets and fowling pieces, were infrequently associated with criminal violence. Ex. 10, Roth Decl. ¶ 15. They were liable to misfire, slow to reload, and infrequently stored ready to fire, reducing the likelihood of impulsive use. *Id*. ¶ 16. Only 10% to 15% of family, intimate, and partner homicides in the Colonial and Founding Eras were committed with guns. *Id*. ¶ 15. But advances in technology in the first half of the 19th century made guns a much more frequent murder weapon, increasing to a third or two-fifths of homicides. *Id*. ¶ 23.

The emergence of percussion cap pistols propelled the upward trend in homicides. *Id*. ¶ 13. Percussion cap pistols, unlike the flint-lock pistols they had replaced by the mid-1820s, could be

kept loaded and carried around for longer periods without risk of corrosion. *Id*. ¶ 25. As with Bowie knives, this new form of weaponry contributed to rising crime rates. *Id*. ¶ 27.

Legislatures responded by passing laws regulating pistols. Between 1813 and 1838, at least six states[23] enacted prohibitions on carrying certain concealable weapons, including pistols. *Id*. ¶ 26; Ex. 14, Table 1. A seventh state prohibited pistol carrying in 1870. Ex. 14, Table 3 (Tennessee). At least three of these states also prohibited selling pistols.[24] Some of the early laws prohibiting concealed carry of pistols included exceptions for "horseman's pistols" or "army or navy pistols"—both of which were large and difficult to conceal. *Id*. ¶¶ 26, 36. These exceptions reflect the societal concern of the era: concealable weapons associated with criminal violence.

Prohibitions restricting concealed carry of weapons proliferated throughout the remainder of the 19th century. This proliferation also arose in response to another advance in technology: the emergence of the first reliable multi-shot handguns in the Civil War and Reconstruction Era, especially the Colt revolver. *See supra* Section I.B.2. Ex. 11, Spitzer Decl. ¶ 48. As with prior technological advancements, its growing adoption coincided with escalating violence. *Id*. Once again, legislatures responded. Beginning around 1870, legislatures began adding "revolver[s]" to the same "dangerous and unusual weapons" statutes that, throughout the 19th century, had prohibited carrying—usually, but not always,[25] concealed—Bowie knives, clubs and other blunt fighting weapons. An 1872 Wisconsin law exemplified this trend in making it unlawful for "any person" to "go armed with a concealed dirk, dagger, sword, pistol, or pistols, revolver, slungshot,

---

[23] Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia. The Georgia Supreme Court upheld its restriction on concealed carry of pistols—consistent with the concern about the danger caused by concealed weapons—while ruling that open carry could not be prohibited. *Nunn v. Georgia*, 1 Ga. 243 (Ga. 1846).

[24] Ex. 10, Roth Decl. ¶ 36 (1881 Ark. Acts 191, 1879 Tenn. Pub. Act 135-36); Ex. 11, Spitzer Decl., Ex. E at 21 (1837 Ga. Acts. 90).

[25] An 1891 West Virginia statute prohibited any person from "carry[ing] about his person any revolver or other pistol . . . or any other dangerous or deadly weapon of like kind or character[.]" Ex. 14, Table 1.

brass knuckles, or other offensive and dangerous weapon[.]"[26] By the turn of the century, at least 12 states and territories had enacted laws making revolvers subject to concealed carry prohibitions; at least another five had followed suit by 1917.[27] While many legislatures, but not all, expressly regulated revolvers, there was near unanimity among the states by the turn of the century in severely restricting concealable firearms and other weapons. Ex. 11, Spitzer Decl. ¶ 48 & Ex. B.

In all, this shows a pattern preceding the Founding and continuing into the 19th century: When new weapon technology emerged, proliferated among civilians, and contributed to increased violence, legislatures imposed categorical weapon regulations. Legislatures did so to reduce homicides, violence, and disruptions to public order. At the same time, Americans retained the ability to own and carry other weapons for lawful self-defense.

### b. This tradition continued when 20th century legislatures regulated machine guns and assault weapons.

The historical tradition of regulating "dangerous and unusual" weapons, including specific types of firearms, continued into the 20th century. During and after World War I, firearms technology began to most closely resemble the assault weapons and large-capacity magazines covered by the Act, and the form of the regulatory response looked increasingly like—and even more severe than—the Act. Hand-held semi-automatic and automatic weapons comparable to assault weapons did not emerge until World War I. Ex. 11, Spitzer Decl. ¶¶ 14–15. When they did, they began to impact civilian life through criminal violence, and legislatures continued their practice of responding with categorical regulations. Commensurate with the danger these weapons posed, the regulations moved beyond carry-related restrictions to outright possession bans.

---

[26] Ex. 14, Table 1 (Wisc. Sess. Law 17, Ch. 7, § 1).

[27] Ga. (1870); Wisc. (1872); Colo. (1881); W.Va. (1882); Or. (1885); Mont. (1883); Okla. (1890); Mich. (1891) (state enactment applicable to city of Saginaw); Alaska (1896); Wash. (1897); Iowa (1897); N.J. (1905); Mass. (1906); Idaho (1909); N.D. (1915); Or. (1917). Ex. 14, Table 3.

For example, the proliferation of the Thompson submachine gun (the "Thompson") and the Browning Automatic Rifle—both built for the battlefield, like assault weapons—triggered a widespread regulatory response when they started being used to perpetrate high-profile crimes. Ex. 11, Spitzer Decl. ¶¶ 15–16. The Thompson was used in the infamous St. Valentine's Day Massacre of 1929—in Chicago, Illinois. *Id.* ¶ 15. News reports detailed lurid accounts of gangsters using the Thompson to inflict criminal violence. *Id.* ¶ 22. Demands for legislative action followed.

As in prior eras, legislatures responded: between 1925 and 1933, at least 29 states enacted anti-machine gun laws. *Id.* at Exs. B, D. Many laws went further than prior concealed-carry restrictions by banning possession of a machine gun with limited exceptions. *Id.* ¶ 23 & Ex. E.[28] Congress followed suit. In 1932, it banned machine guns for the District of Columbia, and defined a machine gun as "any firearm which shoots automatically *or semiautomatically* more than twelve shots without reloading." *Id.* ¶ 24 (quoting 47 Stat. 650, ch. 465, §§ 1, 14 (1932)) (emphasis added). Congress was not alone in characterizing both automatic and semiautomatic firearms as machine guns: 7 states also enacted laws restricting possession of semi-automatic weapons. *Id.* ¶ 28.

With the National Firearms Act of 1934, Congress further responded to the dangers posed by both automatic weapons, like the Thompson, and other firearms associated with criminal violence, like concealable short-barreled shotguns and rifles. *Id.* ¶¶ 25–28. *See* National Firearms Act of 1934, ch. 757, Sec. (a)-(b), 48 Stat. 1236, Pub. L. 73-474 (1934). And, in 1939, the Supreme Court held in *Miller* in reference to short-barreled shotguns that the Second Amendment does not guarantee "the right to keep and bear such an instrument." 307 U.S. at 178. *Cf. Heller*, 554 U.S. at 627 (citing *Miller*); *Bruen*, 142 S. Ct. at 2128 (same).

---

[28] Mass. (1927); Mich. (1927); Ill. (1931); S.C. (1934); Mo. (1929); Tex. (1933); Minn. (1933); Wash. (1933); Pa. (1929); N.Y. (1933); Cal. (1927); Kan. (1933); La. (1932); Wisc. (1933). Ex. 14, Table 4.

These early 20th century laws illustrate a continuing tradition of regulating dangerous and unusual weapons—particularly when those weapons embody technological advances and become associated with prominent public violence. This tradition runs through the 20th century to the present: through the federal assault weapons ban of 1994, to the laws of 8 states and numerous localities that have regulated these weapons, and, ultimately, to the Act challenged here.

### 3. The Act is relevantly similar to historical regulations.

The regulations comprising the historical tradition of regulating "dangerous and unusual weapons" are relevantly similar to the Act in terms of the metrics identified in *Bruen*: how and why they burden a law-abiding citizen's right to armed self-defense. 142 S. Ct. at 2133. The Act imposes minimal burden, if any, on the right to self-defense. Neither assault weapons nor LCMs are necessary for self-defense, and the Act leaves Illinois residents free to purchase, keep, and carry firearms that are commonly used for self-defense, including handguns, shotguns, and many types of rifles. Whatever minimal burden may exist is justified by the same overriding interest that motivated prior generations to enact similar regulations: the need to protect the public from unusually lethal weapons associated with increased criminal violence.

#### a. The Act's minimal burden on the right to self-defense is equivalent to, or less than, comparable historical regulations.

At most, the Act minimally burdens individuals' Second Amendment rights to possess firearms for self-defense because they can continue to lawfully buy, sell, and keep firearms commonly used for self-defense: semi-automatic handguns, shotguns, and many types of rifles. The burden is relevantly similar to historical regulations that restricted categories of firearms and other "dangerous and unusual" weapons, without affecting more common weapons like muskets. None of these categorical regulations, then or now, meaningfully impair the right to self-defense.

The Act does not ban "an entire class of 'arms'" commonly used for self-defense, like the prohibition on handguns in *Heller*. 554 U.S. at 628. The Act's definition of "assault weapon" does not reach all rifles, all handguns, or all shotguns. 720 ILCS 5/24-1.9(a)-(b). There are numerous firearms within each of these broad classes that can still be legally bought, sold, and possessed in Illinois. Because Illinois residents retain access to these weapons, all of which are effective means of self-defense, the Act imposes a *de minimis* burden on individuals' Second Amendment rights.

Plaintiffs attempt to equate the Act's restrictions on AR-15-style rifles as a ban on semi-automatic firearms as a whole. *See, e.g.*, Compl. ¶¶ 26–31. But the Act does not even come close to prohibiting *all* semi-automatic handguns, rifles, or shotguns. Multiple courts have likewise concluded that prohibitions on "assault weapons" are not class-wide bans under *Heller*. *See Worman*, 922 F.3d at 37 (upholding ban because it "proscribe[d] only a set of specifically enumerated semi-automatic assault weapons"); *Kolbe*, 849 F.3d at 138 (rejecting attempt to frame the AR-15 and other assault weapons as "a class of weapons" under *Heller*). A ban on LCMs is also not the type of class-wide ban *Heller* disfavored. *See ANJRPC*, 910 F.3d at 117–18 (concluding a LCM ban was not a class-wide ban under *Heller*).[29] Another judge in this district has already concluded that the Act is not like the *Heller* ban. *Bevis*, 2023 WL 2077392, at *9, 16.

The Act also imposes a minimal burden as applied to Plaintiffs. If McHenry County wishes to purchase additional restricted weapons for law enforcement, then the Act permits those purchases. 720 ILCS 5/24-1.9(e)(1)-(3). Mr. Kenneally is suing in his official capacity and has not made any allegations about his personal interest in obtaining weapons and accessories restricted by the Act. To the extent he purports to sue on behalf of others, residents who lawfully owned

---

[29] *Bruen* abrogated *Worman*, *Kolbe*, and *ANJRPC* because of their use of means-end scrutiny. *See Bruen*, 142 S. Ct. at 2111, 2126. The cited portions remain relevant to the question of how, if at all, the restrictions in the Act burden the right to self-defense.

weapons and accessories restricted by the Act as of the effective date can continue to lawfully own and possess them. *Id.* § 1.9(d). The only other rights Plaintiffs identify as potentially burdened by the Act are those of a gun store located in McHenry County. Mem. ¶ 66. Plaintiffs provide no allegations and no evidence to describe the alleged burden on the store. As an initial matter, the store, Marengo Guns, Inc., is already seeking to vindicate its rights as a named plaintiff in *Harrel*, and it is unclear whether the store has agreed to participate in this duplicative lawsuit that Mr. Kenneally chose to file in a different forum. Nor is it clear whether Mr. Kenneally can use his office to advocate for the interests of a single private business. But even leaving aside the problems posed by Mr. Kenneally's copycat lawsuit, gun stores remain free to keep selling assault weapons and large capacity magazines to certain customers—including the County. 720 ILCS 5/24-1.9(e) (permitting sale of assault weapons to excepted persons and entities), *id.* § 1.10(e)-(f) (same for large capacity magazines). While stores might have fewer customers for these items, an impact on their commercial success is not a Second Amendment violation.[30] The right protected is individual lawful self-defense, not an unlimited ability to profit from firearm sales.

Because the Act preserves access to many firearms for self-defense, while focusing on a subset of "highly dangerous" weapons and accessories particularly susceptible to criminal misuse,

---

[30] The Second Amendment protects an individual right to armed self-defense—not a commercial right to sell any weapon to any customer. Multiple courts have held under *Bruen*'s "plain text" step that Second Amendment does not protect the right to sell firearms. *See United States v. Tilotta*, No. 19-cv-4768, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) (applying *Bruen*'s "plain text" requirement to hold that the commercial sale and transfer of firearms was "not cover[ed]" by the Second Amendment); *United States v. Flores*, No. H-20-427, 2023 WL 361868, at *3 (S.D. Tex. Jan. 23, 2023) (applying *Bruen*'s "plain text" requirement and concluding "selling guns at wholesale or retail" did not fit within the meaning of to "keep and bear"); *Gazzola v. Hochul*, No. 22-cv-1134, 2022 WL 17485810, at *14 (N.D.N.Y. Dec. 7, 2022) (finding no authority "supporting a Second Amendment right for an individual or a business organization to engage in the commercial sale of firearms"); *Defense Distributed v. Bonta*, No. 22-cv-6200, 2022 WL 15524977, at * 4 (C.D. Cal. 2022) (state law prohibiting sale of tools and parts to self-manufacture firearms did not reach conduct covered by the Second Amendment's plain text), *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022). As a result, a gun store has no constitutional claim on its own behalf and can only attempt to bring claims on behalf of customers—*i.e.*, the same Second Amendment claims that individual plaintiffs are pursuing in *Harrel* and other actions (which fail as discussed in Sections I.B and I.C).

it is relevantly similar to historical regulations of "dangerous and unusual weapons." *Heller*, 554 U.S. at 627; *Bevis*, 2023 WL 2077392, at *16. The Act is similar to the restrictions on pistols and, later, revolvers that legislatures enacted in the 17th, 18th, and 19th centuries. *See generally Bevis*, 2023 WL 2077392, at *10–14 (detailing the historical tradition of regulating "dangerous or unusual" weapons and concluding that "assault weapons and large-capacity magazines fall under this category"). Legislatures from prior eras enacted regulations that kept these "dangerous or unusual" weapons out of public spaces because of their propensity to cause criminal violence. Ex. 11, Spitzer Decl. ¶ 82; Ex. 10, Roth Decl. ¶ 26–28, 35–40; Ex. 12, Delay Decl. ¶ 65. Bowie knives, other "fighting knives," clubs, and popular melee weapons ("slung shots," bludgeons, billy clubs) were also subject to regulation as "dangerous or unusual weapons," often in the very same statutes. Ex. 11, Spitzer Decl. ¶ 70–81, Ex. B, C, H. *See Bevis*, 2023 WL 2077392, at *10–13.

These historical regulations frequently took the form of bans on concealed carry, and sometimes prohibitions on any form of public carry, concealed or otherwise. Ex. 11, Spitzer Decl., Exs. B, C, E. *Bevis*, 2023 WL 2077392, at *13. Beginning as early as 1837, multiple legislatures in the 19th century also enacted prohibitions on the sale of specific "dangerous or unusual weapons," including pistols.[31] Later, following World War I, legislatures responded to the machine guns and high-capacity semi-automatic weapons that had migrated from 20th century battlefields into American communities and homes. Ex. 11, Spitzer Decl. ¶¶ 14–29. Given that the danger posed by these firearms went well beyond their concealable nature, numerous legislatures enacted bans on possession. *Id*. ¶ 31, Ex. D (collecting machine gun laws). Many early 20th century legislatures also expressly banned the sale of machine guns.[32] They also regulated based on

---

[31] Ex. 10, Roth Decl. ¶ 36 (1881 Ark. Acts 191, 1879 Tenn. Pub. Act 135-36); Ex. 11, Spitzer Decl., Ex. E at 21 (1837 Ga. Acts. 90)

[32] *See* Ex. 11, Spitzer Decl., Ex. D; Ex. 14, Table 4: S.C. (1934); Mo. (1929); Minn. (1933); N.D. (1931); Ill. (1931); Tex. (1933); Pa. (1929); Wash. (1933); N.Y. (1933); Cal. (1933); La. (1932); Neb. (1929); Wisc.

ammunition capacity, including for semi-automatic weapons.[33] Between 1917 and 1934, "[t]wenty-three states imposed some limitation on ammunition magazine capacity, restricting the number of rounds from anywhere between one (Massachusetts and Minnesota) and eighteen (Ohio)." *Bevis*, 2023 WL 2077392, at *12 n.39 (collecting statutes).

The Act operates in ways comparable to these historical regulations. *See Bruen*, 142 S. Ct. at 2133 (considering "how" historical analogues and modern regulations burden Second Amendment rights). Like regulations from the 18th, 19th, and 20th centuries, the Act allows law-abiding citizens to keep and acquire firearms commonly used for self-defense, but restricts assault weapons and large capacity magazines because they are particularly dangerous, unusual, and prone to criminal misuse. *See Bevis*, 2023 WL 2077392, at *15 (noting "assault weapons are used disproportionately in mass shootings, police killings, and gang activity"). Of course, regulations of "dangerous and unusual" weapons from prior eras differ somewhat among themselves as a group and compared to the Act. But *Bruen* does not require "historical *twins*," only "historical *analogues*." *See Bruen*, 142 S. Ct. at 2133.

In sum, the Act imposes no burden on the "central component" of the Second Amendment, the right to self-defense, because many, many semi-automatic handguns, rifles, and shotguns remain available to Plaintiffs to buy, sell, and possess. The Act is no more burdensome than other categorical restrictions that cases like *Heller* and *Miller* have said are permissible. The Act follows the well-established historical tradition of regulating dangerous and unusual weapons.

---

(1931-33); N.J. (1927).

[33] *See, e.g.*, 1927 R.I. Pub. Laws 256–57, ch. 1052 §§ 1, 4 (prohibiting "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub. Acts 888-89 § 3 (regulating guns that could fire "more than sixteen times without reloading").

**b. The Act's justifications are the same as historical analogues, but even more compelling.**

Whatever minimal burden the Act imposes is equally justified compared to regulations from prior eras. As discussed above, the categorical weapons restrictions enacted by past legislatures responded to increases in societal violence. Near-ubiquitous Bowie knife restrictions proliferated at a time when interpersonal conflicts and homicides were rapidly increasing, driven in substantial part by the availability and use of these knives. Ex. 11, Spitzer Decl. ¶ 63. Restrictions on concealable pistols similarly followed their increased use in homicides. Ex. 10, Roth Decl. ¶ 24. And later, as the spread of multi-shot revolvers coincided with more violence, regulations began to target this new category of weapons. When automatic and semi-automatic firearms began to inflict carnage among civilians, like Chicago's St. Valentine's Day Massacre, legislatures responded by banning the possession and sale of these weapons.

The impetus for the Act is relevantly similar and even more compelling. Before the current era, no single person armed with a single firearm could kill as many people in so little time. Since 9/11, the deadliest individual acts of intentional violence in the United States have been mass shootings. Ex. 4, Klarevas Decl. ¶ 11 & Table 1. The frequency of high-fatality mass shootings has also increased—especially after the expiration of the federal assault weapons ban. *Id*., Figs. 1 & 2. Most have involved assault weapons, large capacity magazines, or both. *Id*. Figs. 3–5.

The Illinois General Assembly passed the Act not long after the Nation's grim tide of mass shootings reached Highland Park, Illinois—where a lone gunman used an AR-15 and large capacity magazines to fire 83 rounds in less than a minute, killing 7 and wounding 48 more at a July 4th parade. In doing so, the General Assembly followed legislatures from prior eras who sought to prevent heinous acts of violence by limiting access to the weapons that made them possible. In *Bruen*'s language, the "why" behind the Act is indistinguishable from the motivations

that drove our ancestors to regulate the "dangerous and unusual" weapons of their times. 142 S.

Ct. at 2133. Plaintiffs' Second Amendment challenges to the Act are unlikely to succeed.

### c. Plaintiffs' attempts to distinguish the Act from the historical tradition of regulating dangerous and unusual weapons will fail.

In their reply, Plaintiffs may try to discount the extensive historical tradition supporting the

Act in two ways: by ignoring the 20th century, and by portraying earlier regulations as nothing

more than concealed-carry limitations. But both tactics disregard the Supreme Court's instruction

that "analogical reasoning" not impose a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133.

Willful blindness regarding the 20th century is at odds with *Heller* and *Bruen*. *Heller*

specifically examined the interplay between 20th century firearms technology—machine guns—

and a significant milestone in the regulatory response they generated—the National Firearms Act

of 1934. 554 U.S. at 625. The *Heller* majority was "startl[ed]" at the possibility, which it took as

a logical implication of the dissent's reasoning, "that the National Firearms Act's restrictions on

machineguns . . . might be unconstitutional[.]" 554 U.S. at 624. *Heller* likewise considered a 1939

case, *United States v. Miller*, 307 U.S. 174 (1939), upholding indictments under the same statute

against defendants caught transporting short-barreled shotguns, another weapon type the statute

regulated. *Heller* read *Miller* as standing for the proposition that "*the type of weapon at issue* was

not eligible for Second Amendment protection," and that "the Second Amendment right, whatever

its nature, extends only to certain types of weapons." 554 U.S. at 622–23. The *Heller* majority

accepted this proposition as in line with "the historical understanding of the scope of the right"

they articulated. *Id.* at 625. In other words, *Heller* considered 20th century regulations of 20th

century weapons and understood those regulations as in line with earlier history.

In keeping with *Heller*, *Bruen* did not foreclose consideration of 20th century evidence. To

the contrary: by acknowledging that "dramatic technological changes" or "unprecedented societal

45

concerns" requires a "more nuanced approach," *Bruen* left the door open. 142 S. Ct. at 2132. It would be impossible to account for technological changes without looking at the time period in which those changes arose. *Id.* The same is true for societal concerns with no precedent before the 20th century (or the 21st, for that matter). *Id.* In short, both *Heller* and *Bruen* permit consideration of 20th century evidence—especially in a case like this one involving both "dramatic technological changes" and "unprecedented societal concerns." *Id.*

## II.    Plaintiffs have not shown they will suffer irreparable harm.

Plaintiffs have not shown they will "*likely* suffer irreparable harm" absent injunctive relief, *Orr*, 953 F.3d at 502. Plaintiffs have the burden to establish irreparable harm by making a "clear showing" that they are entitled to relief. *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs have not made such a showing, and their motion can be independently denied on this basis.

Plaintiffs' claim of irreparable harm relies solely on their allegation that Mr. Kenneally, in his official capacity as a State's Attorney, "will otherwise be required to enforce unconstitutional laws against the public." Compl. ¶ 73. *See also* Mem. ¶ 72 (arguing he "will suffer irreparable harm from being compelled to enforce" the Act"). First, as explained above, the Act is constitutional. Second, the requirement to do something in one's official capacity is not a tangible harm. *People Who Care v. Rockford Bd. of Educ.*, 171 F.3d 1083, 1089–90 (7th Cir. 1999). Third, Plaintiffs have not explained with any specificity what harm they will suffer. Mr. Kenneally did, however, publish an op-ed in the *Chicago Tribune* a few days after filing his complaint, acknowledging that laws are presumed to be constitutional and public officials are obligated to enforce laws they believe to be unconstitutional. Ex. 1-N. Mr. Kennelly explained:

> Public officials swear to uphold the Illinois and United States constitutions. However, not enforcing a law because one subjectively believes it to be unconstitutional betrays a fundamental misapprehension of constitutional law. A law duly passed by a legislative body is constitutional. It remains constitutional

> until a court declares it not to be, not before and no matter how convinced one may
> be of a particular court outcome.

*Id.* Under Plaintiffs' own logic, Mr. Kenneally will not suffer if a preliminary injunction does not

issue because the Act remains presumptively constitutional until he is told otherwise by a court.

Even without this lawsuit, the clarity Mr. Kenneally seeks about the Act will be provided to him

in *Harrel*—the case where he is also a defendant—or from the multiple other lawsuits posing the

same constitutional questions. Neither Mr. Kenneally nor his county needs an injunction to protect

them from irreparable harm.

Plaintiffs' legal citations also do not cure their total failure to demonstrate the risk of

irreparable harm absent the extraordinary remedy of an injunction against, in Mr. Kenneally's

words, "[a] law duly passed by a legislative body[.]" Ex. 1-N. They cite three cases for the

uncontroversial proposition that constitutional injuries can be irreparable ones, Mem. ¶ 72, but

none of those cases involved harm comparable to Plaintiffs' allegation here. In *Elrod v. Burns*,

plaintiffs were public employees who had been threatened with discharge from their jobs if they

exercised their First Amendment freedoms. 427 U.S. 347, 373-74 (1976). In *Mills v. District of

Columbia*, plaintiffs were stopped by police and deprived access to public streets. 571 F.3d 1304,

1312 (D.C. Cir. 2009). In contrast, Mr. Kenneally has not alleged his job has been threatened or

that he otherwise is being harmed in a specific and tangible way. *See* Compl. ¶ 73. Plaintiffs' final

cited case similarly fails to show a basis exists here to find irreparable harm is likely: In *Planned

Parenthood Arizona, Inc. v. Humble*, the defendant did not argue that plaintiffs had not shown a

likelihood of irreparable harm and the court found any argument based on that factor waived

without analyzing it. 753 F.3d 905, 917-18 (9th Cir. 2014).[34] Defendants here dispute that Plaintiffs

have shown any likelihood of irreparable harm.

---

[34] Plaintiffs' pincite is to the opinion's legal standard for preliminary injunctions. To the extent Plaintiffs

### III.  An injunction would harm the public interest.

The public has a fundamental interest in limiting the death and suffering wrought by mass shootings. Courts have repeatedly held that regulations of assault weapons and LCMs promote a "compelling interest in protecting the public" by reducing risk of death and injury. *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017); *see also N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015).[35] In a similar context, the Tenth Circuit affirmed a decision not to enjoin a rule restricting bump stocks (which modify semi-automatic weapons to replicate automatic fire), finding that "the public has a strong interest in banning the possession and transfer of machine guns" and that "[t]he ban supports the safety of the public in general . . . and the safety of law enforcement officers and first responders." *Aposhian v. Barr*, 958 F.3d 969, 991 (10th Cir. 2020).

Empirical evidence shows that an injunction would undermine this vital public interest because assault weapons and LCMs pose an imminent threat to health and safety. Widespread availability of assault weapons and LCMs causes more frequent and more lethal mass shootings. Ex. 4, Klarevas Decl. ¶ 11. Assault weapons are increasingly the weapons of choice for mass shooters. *Id.* ¶¶ 12–13. Bullets fired from assault weapons inflict more harm compared to other kinds of guns, shattering bones and shredding organ tissue beyond the ability of ordinary weapons. Ex. 9, Schreiber Decl. ¶¶ 24, 33–40; Ex. 13, Hargarten Decl. ¶¶ 31–35. At the same time, LCMs make shootings more deadly by increasing the number of rounds that can be fired during a short time. Ex. 6, Busse Decl. ¶ 23; Ex. 4, Klarevas Decl. Fig. 10; Ex. 13, Hargarten Decl. ¶¶ 28, 30;

---

cite *Humble* only for its restatement of the legal standards for preliminary injunctions, *id.* at 911, Defendants agree that *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) identifies relevant factors for courts.

[35] Although these cases applied a form of means-end scrutiny that has since been foreclosed by *Bruen*, their discussion of the public interest remains directly relevant to the preliminary injunction factors. *See Antonyuk v. Bruen*, No. 22-cv-734, 2022 WL 3999791, at *36 (N.D.N.Y. Aug. 31, 2022).

Ex. 8, Yurgealitis Decl. ¶ 95. The public's interest in restricting assault weapons and LCMs "could not be more undeniably compelling." *Ocean State Tactical*, 2022 WL 17721175, at *19.

## IV.     The balance of equities tips firmly in favor of upholding the Act.

The threat that assault weapons and LCMs pose to public safety tips the balance of harms heavily against a preliminary injunction. The public's interest in limiting the catastrophic effects of mass shootings[36] far exceeds any speculative injury to Plaintiffs. And because Plaintiffs are unlikely to prevail on the merits of their claims, they face a heightened burden to show that the balance of equities warrants injunctive relief. Enjoining the Act would allow future potential perpetrators of mass shootings ready access to potent tools for mass murder. Compared with the risk of profound and irreparable damage to Illinois residents posed by continued access to these weapons, Plaintiffs' legally incorrect and vague allegation that he will "be required to enforce unconstitutional laws against the public" cannot justify a preliminary injunction. Compl. ¶ 73. A district court deciding whether to issue the extraordinary relief of a preliminary injunction must "seek[] at all times to minimize the costs of being mistaken." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) In this case, the costs of mistakenly enjoining the Act are dire.

## V.     Plaintiffs do not have standing to have the Act enjoined.

Plaintiffs also are not entitled to a preliminary injunction because they will be unable to show they have standing to pursue permanent injunctive relief. *See, e.g.*, *Simic v. City of Chicago*, 851 F.3d 734, 737–38 (7th Cir. 2017) (affirming denial of preliminary injunction in part because the plaintiff "does not have standing to seek injunctive relief"). As explained in Defendants' March 16 filing, Dkt. 12, Plaintiffs have not established standing to pursue relief in any court—federal or state. Mr. Kenneally fails to allege he faces expulsion from office, disciplinary action, or any other

---

[36] Where an injunction would prevent the enforcement of a public-safety statute, the interests of the public and the interests of the government are one and the same. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

personal consequences from the Act. As for McHenry County, it also does not identify a distinct injury to a legally cognizable interest. For these legal reasons, Plaintiffs cannot show a strong likelihood of success on the merits of their claims. And those arguments aside, Plaintiffs' standing allegations are categorically insufficient to support their request for a preliminary injunction. Their "burden to demonstrate standing in the context of a preliminary injunction motion is at least as great as the burden of resisting a summary judgment motion," which means they "must set forth by affidavit or other evidence specific facts, rather than general factual allegations of injury." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (cleaned up). But Plaintiffs have not attempted to satisfy this standard; they have submitted no evidence at all.

## CONCLUSION

For the above reasons, Defendants request that Plaintiffs' motion be denied.

Dated: March 24, 2023

Respectfully submitted,

KWAME RAOUL
*Attorney General of Illinois*

/s/ Christopher G. Wells
Christopher G. Wells, No. 6304265
Chief, Public Interest Division
Office of the Attorney General
100 W. Randolph Street, 12th Floor
Chicago, IL 60601
(312) 814-3000
Christopher.Wells@ilag.gov

*Counsel for Attorney General Raoul and Governor Pritzker*

 /s/ Kathryn Hunt Muse
Kathryn Hunt Muse, No. 6302614
Deputy Chief, Public Interest Division
Office of the Attorney General
100 W. Randolph Street, 12th Floor
Chicago, IL 60601
(312) 814-3000
Kathryn.Muse@ilag.gov

*Counsel for Attorney General Raoul and Governor Pritzker*

Exhibits to follow:

1. Newspaper Articles Cited
2. Declaration of Robert Morgan

3. Declaration of William E. Demuth II
4. Declarations of Louis Klarevas
5. Declarations of Phil Andrew
6. Declarations of Ryan Busse
7. Declarations of Dennis Baron
8. Declarations of James E. Yurgealitis
9. Declarations of Martin A. Schreiber
10. Declarations of Randolph Roth
11. Declarations of Robert Spitzer
12. Declarations of Brian Delay
13. Declarations of Stephen Hargarten
14. Excerpts from Historical Regulations Cited
15. Cited cases opinions from Westlaw